#29194-r-MES
**2021 S.D. 46**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                     Plaintiff and Appellee,

    v.

JAMESON CHARLES MITCHELL,                  Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FIRST JUDICIAL CIRCUIT
YANKTON COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE CHERYLE GERING
Judge

* * * *

JASON R. RAVNSBORG
Attorney General

ERIN E. HANDKE
Assistant Attorney General
Pierre, South Dakota                       Attorneys for plaintiff
                                           and appellee.


KEVIN J. LOFTUS of
Kennedy, Pier, Loftus
   & Reynolds, LLP
Yankton, South Dakota                      Attorneys for defendant
                                           and appellant.

* * * *

CONSIDERED ON BRIEFS
MAY 27, 2020
OPINION FILED **08/04/21**

#29194

SALTER, Justice

[¶1.]	After a brief confrontation with Lucas Smith at a local bar, Jameson Mitchell armed himself with a handgun and encountered Smith in a nearby alley. Smith ran toward Mitchell, shouting for Mitchell to shoot him. After taking a few steps back, Mitchell fired at the charging Smith, fatally wounding him. Pursuant to a plea agreement with the State, Mitchell pled guilty to first-degree manslaughter under the theory that he was "resisting an attempt by the person killed to commit a crime." The circuit court imposed a 124-year prison sentence. We vacate the sentence and remand for resentencing.

## Background

[¶2.]	Jameson Mitchell (Mitchell) approached Lucas Smith (Smith) and Smith's friend, Jamie White (White), in the game room at Mojo's bar in Yankton shortly after midnight on April 6, 2019. Mitchell had consumed six, 16-ounce beers earlier in the evening and allegedly confronted the couple because he believed Smith had been making negative comments about him to others.

[¶3.]	Video surveillance from Mojo's shows Mitchell approaching Smith and White, who were sitting near a pool table. Both Smith and White stood up and a brief physical skirmish ensued, though it is difficult to determine which party acted first. A bystander attempted to intervene before White grabbed Mitchell by the hair and pulled him around the game room. Bar employees responded by removing all three individuals, escorting Mitchell to one door and Smith and White to another.

[¶4.]	Although not revealed by the surveillance video, tensions apparently flared again outside of Mojo's, prompting bar employees to order Mitchell, Smith,

and White to leave the property entirely or face a response from law enforcement. White followed Smith to a friend's unlocked car parked in a nearby parking lot. White later related that Smith was extremely distraught and expressed suicidal thoughts while the two were in the car. In her testimony before the grand jury, White stated that once inside the car, Smith "started screaming and punching and yelling that he just wanted to die and that he didn't want to be here anymore . . . ." They got out of the car a short while later because Smith indicated he "needed to breathe[,]" and they saw Mitchell in the alley.

[¶5.] After his involuntary departure from Mojo's bar, Mitchell went back to his apartment where he retrieved a .38 caliber revolver. He later claimed the revolver was for protection, and said he was on his way to go out to eat with friends at a local restaurant. However, he first went to the alley near Mojo's where he again encountered Smith.

[¶6.] Surveillance video from a nearby auto body shop showed a portion of the confrontation between the two young men from two separate camera angles. At approximately 12:45 a.m., the recorded video footage shows Mitchell entering the alley from the right moving to the left. Initially, Mitchell is seen jogging and skipping while holding his gun. Mitchell soon slows his gait but continues advancing and points the gun directly in front of him.

[¶7.] Moments later, Smith bursts into the left side of the camera's view, running full speed at Mitchell. A subsequent investigation revealed that Smith yelled, "shoot me" as he was running toward Mitchell. Mitchell is seen taking a few steps back with his gun pointed at Smith. With Smith very near and closing fast,

Mitchell fires three shots in rapid succession. After the first two shots, Smith is seen veering off to the right and running outside of the camera's view while Mitchell leaves in a different direction. The entire sequence of events transpired in less than 20 seconds.

[¶8.] The body shop surveillance video also shows Smith staggering back into the camera's view from the right before falling to the ground where White comes to attend to him. White immediately called for help, and law enforcement officers and emergency medical personnel arrived a short time later. Smith was transported to a local hospital where he died from a single gunshot wound to the chest later that morning, on his 24th birthday.[1]

[¶9.] Law enforcement officers quickly located Mitchell and arrested him. A Yankton County grand jury returned an indictment charging Mitchell with first-degree murder, alleging he killed Smith "with a premeditated design to effect [his] death." *See* SDCL 22-16-4(1). Mitchell pled not guilty, and in a May 2019 submission to the circuit court, defense counsel indicated the possibility of a self-defense claim based, in part, upon the "history between [Mitchell] and [Smith]."[2]

[¶10.] The relationship between the two men was, in fact, long-standing and complicated. Mitchell and Smith had known each other since elementary school. Mitchell reported several specific instances in which the older Smith bullied him, sometimes using physical violence. As adults, Mitchell had briefly lived with Smith

---

1.  Mitchell was 22 years old at the time of the shooting.

2.  The statement came in the affidavit of Mitchell's lawyer in support of a motion seeking the appointment of a defense investigator, which the circuit court later granted.

and White, who were romantically involved at various times for several years. However, it appears the temporary living arrangement was more a consequence of White's relationship with Mitchell's girlfriend at the time, not a separate friendship with Mitchell.

[¶11.]     The parties engaged in plea negotiations and reached a plea agreement under which the State agreed to dismiss the indictment alleging first-degree murder, and Mitchell agreed to plead guilty to an information charging him with first-degree manslaughter. The parties selected the statutory theory of criminal liability set out in SDCL 22-16-15(4) which describes manslaughter in the first degree as "[h]omicide . . . perpetrated . . . [u]nnecessarily, either *while resisting an attempt by the person killed to commit a crime* or after such attempt has failed." (Emphasis added). The plea agreement provided that the State would recommend a maximum prison sentence of 60 years, but further stated that "[t]he victim's family will be free to make any recommendation they wish and the defense will have an open recommendation."

[¶12.]     At the change of plea hearing, the circuit court asked about the reasons for the plea agreement, and the prosecutor and Mitchell's counsel both indicated that the contingencies of proof made the agreement reasonable. Citing the body shop surveillance video footage, the prosecutor explained:

> There were a number of issues. There is a video of the shooting where Lucas runs directly toward Jameson Mitchell and that's when the shots are fired. Three of them to be exact. There's evidence that Lucas yelled something to the effect of "shoot me" while this was going on.
>
> Your Honor, there are a number of factors. We certainly, at trial, would have done our best to obtain a conviction of the

charges indicted, premeditated first-degree murder. We believe that there was risk, as there is in every jury trial, that there would not be a conviction. That there would be a finding possibly, if there were lesser included offenses, possibly down to second-degree manslaughter.

[¶13.] Defense counsel expressed a similar view and also specifically referenced the surveillance footage:

> Your Honor, I would just reiterate what the State said. There are—there is a video of the shooting . . . that shows that—we believe our client had a self-defense argument, and that's why we think that this plea agreement is reasonable. I agree that the State had a lot of risk potentially that the self-defense argument is successful . . . . So we believe the plea agreement is reasonable and fair to all parties.

[¶14.] The parties stipulated to the factual basis for the plea, which the prosecutor narrated into the record:

> On or about the 6th day of April, 2019, in Yankton County, South Dakota, Jameson Mitchell, Lucas Smith, and a third party were in a physical altercation at Mojo's bar in downtown Yankton. Jameson Mitchell, Lucas Smith, and the third party were removed from the bar by employees where the altercation continued in a verbal manner in the street. The altercation proceeded to an alley in downtown Yankton. In that alley, *Lucas Smith ran at Jameson Mitchell and yelled at . . . Mitchell . . . to shoot him. Jameson Mitchell retreated until Lucas Smith was about to overtake him.* At that point, Jameson Mitchell fired 3 shots from a .38 caliber handgun. One of the shots hit Lucas Smith and he later died.

(Emphasis added).

[¶15.] The plea agreement was not binding upon the circuit court, and the court expressly advised Mitchell at the change of plea hearing that it retained the

discretion to impose a life sentence.[3] Smith's parents made sworn statements at the change of plea hearing, expressing their view that, notwithstanding the plea agreement, the case was more properly viewed as a murder for which Mitchell should receive a life sentence. The court accepted the plea, set a sentencing date, and ordered a presentence investigation (PSI).

[¶16.] Even on our "cold" record, the emotionally-charged setting during the sentencing hearing is unmistakable. Smith's mother and father testified and again asked the circuit court to impose a life sentence. Letters submitted by Smith's family and friends, including White, expressed a similar "life for a life" theme and asked the court to impose the maximum penalty.

[¶17.] Mitchell's mother also testified, detailing Mitchell's normal upbringing, graduation from high school, interest in athletics, involvement with coaching youth sports teams, and strong work ethic. The court received many other letters describing positive aspects of Mitchell's character.

[¶18.] In her sentencing recommendation to the circuit court, the PSI author suggested a 60-year prison term and offered an additional assessment:

> No one has a whole picture of exactly what happened that night. I knew [Smith]. I supervised [Smith] . . . . I have seen [Smith] blow up and become verbally aggressive. But Mr. Mitchell also went to get the gun. He went down that alley. I personally believe Mr. Mitchell that he did not intend on shooting anyone that night. I think that we had a recipe for disaster with Mr. Mitchell. I think he had some alcohol, he had been assaulted and humiliated in public, and then continued to be taunted by [Smith] . . . . I do not think that he intended to shoot or kill

---

3.    First-degree manslaughter is a Class C felony punishable by a maximum
      sentence of life in prison. *See* SDCL 22-6-1(3) (stating the statutory
      maximum sentence for a Class C felony).

anyone. I think that he thought that he could scare [Smith]. I think that when [Smith] began running at him that he was scared and did not know what else to do . . . . No matter what sentence you give, it will never be enough to bring [Smith] back . . . . I do think that [Mitchell] is capable of rehabilitation. I do think that he can live a redeeming life.

[¶19.] Consistent with the limits of the plea agreement, the State recommended a 60-year penitentiary sentence. The prosecutor argued that Mitchell's actions after the shooting—fleeing the scene and hiding evidence[4]— supported the claim that Mitchell "knew what he did was wrong."

[¶20.] Mitchell's attorney, while acknowledging the "emotional strain" borne by Smith's family, also stated that "there are perceptions of what occurred that are just simply incorrect," explaining that any suggestion that the crime was premeditated was not accurate. Mitchell's attorney stated that his client took full responsibility for going down the alley that night knowing that Smith might be there but had no intention to shoot Smith. Mitchell's attorney also detailed what he believed were key points regarding the shooting— the claim that Mitchell told Smith to stop, was moving backwards at the time of the shooting, and "waited until the absolute utmost last second before he fired that gun."

[¶21.] In his statement to the circuit court, Mitchell stated that he had no intention to hurt or kill Smith. He expressed remorse and stated he was accepting responsibility:

---

4. Immediately after shooting Smith, Mitchell hid his handgun and some ammunition in a bag under a nearby tree. Police recovered the evidence approximately five months later after being contacted by Mitchell's attorney, who had learned of the location from his client.

> I did in fact shoot and kill Lucas Smith out of fear and the feeling of being threatened. I am truly sorry to Lucas' family for —I cannot imagine how they can feel toward me or what they have gone through over the last eight months and will continue to go through in the future. And for that I am, without a doubt, with all my heart sorry.

[¶22.] Though, as indicated, Mitchell pled guilty to killing Smith while resisting Smith's own assault, the circuit court did not address Smith's role in any way. Rather, the court seemed to treat Mitchell as though he was solely responsible for the killing. The court told Mitchell, "a lot of people who wrote [letters of support] know one side of you. They don't know everything that has gone on in your life and they clearly are not aware of the events of April 6th, 2019 in any detail." In the court's view, Mitchell was "juiced" from consuming alcohol when he walked into Mojo's bar and was "itching for a confrontation" when he saw Smith. The court further expressed that "[i]t's clear from the video to me that as you are exiting the bar, you are still fired up. And at that time you intentionally went home to get a gun." With regard to Mitchell's choice to get his gun, the court stated that "[w]henever anybody puts a gun on their person or in their hand, they do it with the intent to use it in some fashion."

[¶23.] Citing the body shop surveillance video footage, the circuit court observed that Mitchell ran toward Smith and stopped only after seeing Smith running toward him. The court commented, "[t]here were so many opportunities for you to go the other direction, to not even be there to begin with. But every step you took down that alley, you had the opportunity to turn around and go the other direction." The court also expressed its concern about Mitchell's decision to flee the scene and hide the weapon and a large amount of ammunition.

[¶24.] The circuit court stated that it had considered traditional sentencing factors such as rehabilitation, the need for deterrence, and its desire to keep Mitchell from "having violent actions toward others again." The court indicated it had reviewed all the sentencing evidence and that it believed it had "as good of understanding as a person can have of the person that you are."[5]

[¶25.] The circuit court ultimately sentenced Mitchell to 124 years in the penitentiary with no time suspended and credit for 214 days served. The court indicated it selected the 24-years portion of the sentence to remind Mitchell of Smith's age when he was killed. The court further stated that the sentence "should mean that you are in your 50s at a minimum when you are released from prison. It may be that you are in your 70s or 80s." According to the Department of Corrections' calculations contained in the record, Mitchell's initial parole date is April 5, 2081, when Mitchell is 84 years old. The court's statement about the possibility of an earlier release followed its reference to the 2018 enactment of a "law called earned discharge credit" that we interpret to be SDCL 24-15A-50.1. The

---

5. The PSI related previous instances of reckless behavior when Mitchell drank alcohol, though they were comparatively less serious. The circuit court specifically mentioned a 2017 incident in which Mitchell was found "bloody, half-clothed trying to get in people's vehicles," and was uncooperative with officers' efforts to arrest him. He was ultimately convicted of disorderly conduct. Mitchell had another conviction for petty theft, but had no felony convictions. Citing the underlying incidents leading to these convictions and some speeding tickets, the circuit court concluded that Mitchell was "prone to anger. You feel entitled. In other words, the rules don't apply to you."

statute provides that inmates may receive earned discharge credits by completing programing or satisfactory work, or for "heroic acts in life threatening situations[.]"[6]

[¶26.] Mitchell appeals, claiming the circuit court abused its discretion when it imposed his sentence.

## Standard of Review

[¶27.] "[W]e review the sentencing court's decision for an abuse of discretion." *State v. Rice*, 2016 S.D. 18, ¶ 23, 877 N.W.2d 75, 83 (quoting *State v. Chipps*, 2016 S.D. 8, ¶ 31, 874 N.W.2d 475, 486). "An abuse of discretion is a fundamental error of judgment, a choice outside the range of permissible choices." *Id.* (quoting *MacKaben v. MacKaben*, 2015 S.D. 86, ¶ 9, 871 N.W.2d 617, 622). "This Court . . . will not overturn the circuit court's abuse of discretion unless that 'error is demonstrated and shown to be prejudicial error.'" *State v. Klinetobe*, 2021 S.D. 24, ¶ 26, 958 N.W.2d 734, 740 (quoting *State v. Berget*, 2014 S.D. 61, ¶ 13, 853 N.W.2d 45, 52).

## Analysis

[¶28.] Sentencing courts possess broad discretion "[w]ithin constitutional and statutory limits" to determine "the extent and kind of punishment to be imposed." *Rice*, 2016 S.D. 18, ¶ 23, 877 N.W.2d at 83 (emphasis omitted) (quoting *State v. Grosh*, 387 N.W.2d 503, 508 (S.D. 1986)). "Courts should consider the traditional sentencing factors of retribution, deterrence—both individual and general—

6. The circuit court's suggestion that Mitchell might be eligible for parole in his 50s seems more theoretical than realistic. Any potential for earned discharge credit of this magnitude under SDCL 24-15A-50.1 would depend upon Mitchell having nearly inexhaustible opportunities to earn the credits along with the sustained approval of the warden and the Secretary of Corrections.

rehabilitation, and incapacitation[,]" without regarding any single factor as preeminent over the others. *Klinetobe*, 2021 S.D. 24, ¶ 28, 958 N.W.2d at 741 (citing *State v. Pulfrey*, 1996 S.D. 54, ¶ 15, 548 N.W.2d 34, 38). "The factors are to be weighed 'on a case-by-case basis' depending on the circumstances of the particular case." *Id.* (quoting *State v. Toavs*, 2017 S.D. 93, ¶ 10, 906 N.W.2d 354, 357); *see also State v. Talla*, 2017 S.D. 34, ¶ 14, 897 N.W.2d 351, 355.

[¶29.]     In the exercise of its solemn sentencing role, circuit courts must look at both the person before them and the nature and impact of the offense. As to the former, we have frequently held that "the sentencing court should acquire a thorough acquaintance with the character and history of the [person] before it." *State v. Ceplecha*, 2020 S.D. 11, ¶ 64, 940 N.W.2d 686, 699 (quoting *State v. Larsen-Smith*, 2011 S.D. 93, ¶ 8, 807 N.W.2d 817, 819). "This requires studying 'a defendant's general moral character, mentality, habits, social environment, tendencies, age, aversion or inclination to commit crime, life, family, occupation, and previous criminal record.'" *Id.* (quoting *State v. Bonner*, 1998 S.D. 30, ¶ 19, 577 N.W.2d 575, 580).

[¶30.]     In addition, courts must consider sentencing evidence tending to mitigate or aggravate the severity of a defendant's conduct and its impact on others. Sentencing courts are often required, in this regard, to accurately assess the "true nature of the offense." *Klinetobe*, 2021 S.D. 24, ¶ 36, 958 N.W.2d at 742; *see also State v. Yeager*, 2019 S.D. 12, ¶ 15, 925 N.W.2d 105, 111 (affirming circuit court's consideration of mitigating information and "other factors, including the nature of the offense").

[¶31.]     Whether evaluating a defendant's general inclination to commit crimes or the extent of his specific offense, sentencing courts can consider a wide range of information from a variety of sources. *See State v. Arabie*, 2003 S.D. 57, ¶ 21, 663 N.W.2d 250, 257 ("[T]he range of evidence that may be considered at sentencing is extremely broad."). Courts may even consider conduct that was uncharged or served as the basis for charges that later resulted in a dismissal or acquittal as long as the State proves the conduct by a preponderance of the evidence. *Id.*; *State v. McKinney*, 2005 S.D. 74, ¶ 18, 699 N.W.2d 460, 466.

[¶32.]     Indeed, we recently stated that a circuit court could rely upon an "extensive sentencing record" to assess the nature of a defendant's offense and was not limited to the information contained in a stipulated factual basis statement used to support a defendant's guilty plea. *Klinetobe*, 2021 S.D. 24, ¶ 36 n.6, 958 N.W.2d at 742 n.6. However, a sentencing court may not *disregard* the factual basis statement or overlook the established conduct supporting the essential elements of the offense, including, as is the case here, the actions of the victim.[7]

---

7.    This is not to say that a circuit court must necessarily treat a guilty plea to manslaughter as an unintentional killing where, as in cases like *Klinetobe*, the State reduces a murder charge to a first-degree manslaughter theory that contemplates the killing was "without design to effect death." *See* SDCL 22-16-15(1)-(3). Plea agreements of this sort may simply represent the parties' agreement to allow the defendant an opportunity to admit to a lesser mental state. *See* Tim Dallas Tucker, State v. Black: Confusion in South Dakota's Determination of Lesser Included Offenses in Homicide Cases, 41 S.D. L. Rev. 465, 498 (1996) ("First-degree manslaughter does contain a lesser mental state or culpability [than first or second degree murder] since it is committed 'without a design to effect death.'"). Accordingly, a circuit court can accept the reduced manslaughter plea as provident and still rely upon additional evidence adduced at sentencing to determine the actual level of culpability in order to formulate an appropriate sentence.

[¶33.] Here, the circuit court accepted Mitchell's guilty plea to manslaughter in the first degree under SDCL 22-16-15(4) which specifically requires that the killing occurred "while resisting an attempt by the person killed to commit a crime . . . ." In so doing, the court recognized that Mitchell's use of force against Smith was at least partially justified because he was resisting an effort by Smith to assault him. *See* SDCL 22-18-1(1) (defining simple assault as an "attempt[] to cause bodily injury to another" with "the actual ability to cause the injury[.]")[8] This recognition is an inevitable consequence of the requirement that "[t]he [circuit] court must find a factual basis for each element of the offense[]" before accepting a defendant's guilty plea. *State v. Roedder*, 2019 S.D. 9, ¶ 14, 923 N.W.2d 537, 542 (reh'g denied Mar. 18, 2019) (quoting *State v. Nachtigall*, 2007 S.D. 109, ¶ 5, 741 N.W.2d 216, 219); *see also* SDCL 23A-7-14 (Rule 11(f)).

[¶34.] Of course, Mitchell's decision to respond with *deadly* force was not justified because it was "unnecessar[y]" to address the threat Smith posed. SDCL 22-16-15(4). In the context of justifiable homicide claims, we have expressed the limitations on a defendant's authority to respond to an attack by the victim, explaining that the "force becomes limited to that which is reasonable in the circumstances, and, as the threat of harm dissipates, so does the reasonableness of

---

8. At the sentencing hearing and again on appeal, the parties expressed different views of White's comments about Smith being suicidal when the two were sitting together in the car after leaving Mojo's bar. The circuit court stated its view that Smith was not suicidal when he ran at Mitchell. In our view, a definitive determination on this factual issue is elusive on this record and, in any event, unnecessary given the universal consensus that Smith committed a crime and posed a threat to Mitchell at the time of the shooting.

the force used." *State v. Cottier*, 2008 S.D. 79, ¶ 13, 755 N.W.2d 120, 127 (quoting *State v. Jaques*, 428 N.W.2d 260, 265-66 (S.D. 1988)).[9]

[¶35.]       But this case does not present an all-or-nothing view of justification under which Smith's killing was either excused or not, with acquittal or conviction hanging in the balance.  Mitchell ultimately abandoned any claim that he was not guilty because he acted in self-defense, in favor of the plea agreement under which he admitted to violating SDCL 22-16-15(4), and the State, for its part, acknowledged that he was "resisting an attempt by the person killed to commit a crime[.]"

[¶36.]       This feature of SDCL 22-16-15(4), when applied in circumstances such as these, resembles a criminal law concept known as an "imperfect" self-defense.  Contrasted from a "perfect" self-defense claim where the defendant is "free from fault in bringing about difficulty with his adversary" and "reasonably believe[d]" he needed to respond to an adversary's threat with deadly force, an imperfect self-defense presents manslaughter as a different option for criminal liability, short of murder and without the potential of an outright acquittal.  Wayne R. LaFave, *Substantive Criminal Law*, § 15.3(a) (2020).  The reason for the "imperfection" can either be "the defendant's own fault in bringing on the difficulty or the

---

9.       During its 2021 session, the Legislature passed HB 1212, which added several sections to SDCL Chapter 22-18 relating to the use of force in the defense of a person, a dwelling, or other property.  Within the same bill, the Legislature repealed SDCL 20-9-8, SDCL 22-5-9, SDCL 22-16-34, and SDCL 22-16-35, all of which had previously authorized the use of force in certain instances.

unreasonableness of [his] honest but erroneous belief[]" that he is in danger of serious or fatal injury which he can prevent only by killing the victim. *Id.*

[¶37.]     We have not previously had the opportunity to consider the operation of SDCL 22-16-15(4) or the idea of an imperfect self-defense. We associate those two topics here because of the apparent fact that the parties and the circuit court all acknowledged Mitchell acted, however imprudently, in response to a threat from Smith. Any further exposition of the law of imperfect self-defense, including whether it has a broader application beyond SDCL 22-16-15(4), is best left for another day, particularly given the fact that the parties have not specifically addressed it in their submissions.

[¶38.]     There is no question that the circuit court exercised a careful review of Mitchell's history and characteristics, but it effectively treated Mitchell as solely responsible for Smith's killing without considering Smith's own criminal conduct. As a result, the court overlooked the element of SDCL 22-16-15(4) that contemplates criminal conduct by Smith which provided some degree of partial justification for Mitchell's response. This element, however, was a critical aspect of the case. According to statements by the prosecutor and Mitchell's attorney at the change of plea hearing, Smith's conduct as seen on the body shop surveillance footage was the principal reason for the parties' plea agreement. Early on, the defense indicated the potential for a self-defense claim, and during the change of plea hearing, the prosecutor candidly expressed concern about the "risk . . . that there would not be a conviction."

[¶39.]     Notwithstanding this, the factual premise underlying the circuit court's assessment of the nature of Mitchell's offense is that Smith's killing was inevitable because Mitchell armed himself and went to the alley where he found Smith. However, that view is "outside the range of permissible choices[,]" *Rice*, 2016 S.D. 18, ¶ 23, 877 N.W.2d at 83, because it cannot be reconciled with Mitchell's effort to resist a threat posed by Smith's own "commi[ssion] of a crime." The surveillance footage, as illuminating and stark as it is, does not depict the entire sequence of fateful events that occurred in the alley. Who saw whom first and reacted in what way are lingering questions not resolved by the recorded footage or the balance of the sentencing record. This, we can only surmise, along with what actually *is* shown by the footage, contributed to the parties' view of Smith's conduct and their decision to construct the plea agreement as they did.

[¶40.]     The circuit court's decision to treat Mitchell as solely responsible without regard for Smith's conduct was not harmless. *See State v. Thorsby*, 2008 S.D. 100, ¶ 15-16, 757 N.W.2d 300, 304-05 (holding that improper ex parte communication with the circuit court did not prejudice the defendant in the absence of a showing the court's sentencing decision was "unduly influenced"). By regarding Mitchell's conduct as it did, the court's concern with the punitive objective of sentencing was artificially heightened which affected the ultimate decision to impose a 124-year sentence. Mitchell was 22 years old at the time of the killing, two years younger than Smith. The two had a difficult history that involved Smith bullying Mitchell as younger boys, sometimes using violence. Mitchell's misdemeanor criminal history was unflattering but contained no felony-grade

convictions. Under the circumstances, we believe overlooking Smith's criminal conduct affected the length of Mitchell's sentence.

[¶41.]        Still, the fact remains that Mitchell purposefully armed himself[10] and went to the alley where, as Smith's parents painfully observed, he "took a life." This was a gravely serious offense, and we can understand the circuit court's inclination to impose a stern sentence. However, in order to accurately assess the nature of Mitchell's conduct, the court must consider the fact that he was reacting to a threat posed by Smith's own assaultive conduct.

[¶42.]        We vacate the sentence and remand for resentencing.

[¶43.]        JENSEN, Chief Justice, and KERN, Justice, and GILBERTSON, Retired Chief Justice, concur.

[¶44.]        DEVANEY, Justice, concurs specially.

[¶45.]        MYREN, Justice, not having been a member of the Court at the time this action was submitted to the Court, did not participate.

---

10.    Although he acknowledges that the court "properly admonished [him] for carrying a firearm in a concealed fashion without a permit[,]" Mitchell argues that the court placed too much weight on this uncharged misdemeanor violation. *See* SDCL 22-14-9 (2018) (*repealed by* 2019 S.D. Sess. Laws ch 113, §§ 1, 2) (making the act of carrying a concealed pistol or revolver without a permit a Class 1 misdemeanor). In his view, the court overlooked the mitigating impact of the Legislature's decision to repeal South Dakota's concealed carry law during its 2019 session. However, as the court correctly noted, the change was not effective until several months after the April 6 shooting, and it does not appear from the record that the court placed disproportionate emphasis on the manner in which Mitchell carried the handgun as it determined his sentence.

DEVANEY, Justice (concurring).

[¶46.] I agree with Justice Salter's analysis and conclusion that the circuit court abused its discretion in imposing a 124-year sentence given the evidence in this case. This writing further expounds on why, in my opinion, such a harsh sentence constitutes an abuse of discretion. Although the abuse of discretion standard of review affords much deference to sentencing courts, it is not without bounds.

[¶47.] As noted by Justice Salter, there is no question that a sentencing court can consider facts of record supporting that the defendant committed a greater offense, even though the defendant pled to a lesser offense. Such was the case in *Klinetobe*, where the defendant's factual basis statement for a plea to manslaughter would also have established the elements of first-degree murder. 2021 S.D. 24, ¶ 14, 958 N.W.2d at 738. But, unlike the factual basis in *Klinetobe*, the set of facts agreed on by the State and Mitchell do not support a determination that a greater offense was committed. Moreover, we are presented here with a unique record—the killing of the victim was captured on video. The events immediately preceding the fatal shooting make it abundantly clear why the State agreed in this case to dismiss the murder charges in exchange for a manslaughter plea. It is likewise understandable why the State would agree to cap its sentencing recommendation to 60 years—a stern sentence, nevertheless, for a case with these facts.

[¶48.] There is also no question that a sentencing court is free to disregard the recommendations of the parties, as well as those of the PSI author if, in the court's judgment, a much higher sentence is warranted. But in this case, after

watching the video and reviewing the PSI, it is apparent that a 124-year sentence—more than twice that recommended by those most familiar with the parties and the facts of the case—was not a choice within "the range of permissible choices[.]" *See MacKaben*, 2015 S.D. 86, ¶ 9, 871 N.W.2d at 622 (citation omitted) (explaining what constitutes an abuse of discretion).