#30301-a-PER CURIAM
**2024 S.D. 30**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,        Plaintiff and Appellee,

v.

MIRANDA ANN HENRY, a.k.a.
CRYSTAL TRINITY PUMPKINSEED,        Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SIXTH JUDICIAL CIRCUIT
HUGHES COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE BOBBI J. RANK
Judge

\* \* \* \*

KATIE J. THOMPSON
Pierre, South Dakota        Attorney for defendant
and appellant.


MARTY J. JACKLEY
Attorney General

ERIN E. HANDKE
Assistant Attorney General
Pierre, South Dakota        Attorneys for plaintiff
and appellee.

\* \* \* \*

CONSIDERED ON BRIEFS
MARCH 19, 2024
OPINION FILED **05/29/24**

#30301

PER CURIAM

[¶1.]  Miranda Ann Henry, a/k/a Crystal Trinity Pumpkinseed, appeals from her seventy-five-year sentence for first-degree manslaughter for the death of her boyfriend, Christopher Mexican. She argues that the court abused its discretion in sentencing. We affirm.

## Factual and Procedural History

[¶2.]  On December 30, 2021, Henry was released from prison on parole after serving thirteen months for her fourth DUI conviction. She initially paroled to Aberdeen, but in January 2022, she returned to Pierre to continue her romantic relationship with Christopher Mexican, her on-again, off-again boyfriend of five years. Upon returning to Pierre, she immediately began using alcohol and methamphetamine. She stayed in an apartment with Christopher and his uncle Carlos Mexican.

[¶3.]  For about a week in early February 2022, Henry drank each day nearly all day long. By Monday, February 7, 2022, she decided to stop drinking. She had little recollection of the preceding week. Henry's hallucinations then returned. She had lived with hallucinations on and off since 2014 and had, at times, received psychiatric care.

[¶4.]  On February 8, 2022, Christopher woke Henry up and asked her to get him alcohol. She left the apartment and returned with food and alcohol. Henry was still determined not to drink despite hearing voices and experiencing shakes from alcohol withdrawal. As Christopher drank, he started calling Henry derogatory names. As was a typical pattern in their relationship, he would get aggressive

-1-

when drunk. He told Henry to leave the apartment, and she left to attempt to meet with her parole officer. Henry eventually returned to the apartment. The next morning, Henry could still hear voices. She began drinking to make the voices go away, and she drank so much that she blacked out.

[¶5.] When Henry awoke, she was on the floor next to Christopher and noticed his uncle, Carlos, in the bed. She nudged Christopher, who did not respond. She realized that there was blood everywhere and attempted to wake up Carlos. When Carlos did not wake up, she knocked on the doors of neighboring apartments for help. No one opened their doors to Henry.

[¶6.] Law enforcement responded to the apartment building at about 3:45 a.m. on February 9, 2022, when they received reports of Henry walking up and down the hall, pounding on doors, and asking for help. Officers arrived and saw the door to Christopher's apartment slightly ajar. There were drops of blood on the floor in front of the door. Officers could see a male in the apartment lying on his back, shirtless, and covered in large amounts of blood. He was covered in lacerations on his torso, head, and neck. There also appeared to be stab wounds on his torso. Officers entered the apartment and observed a large laceration on the left side of the man's neck, near his carotid artery. Some blood on his body appeared to be dried. An ambulance was requested, but after arriving, emergency responders could not detect a heart rhythm. Christopher's autopsy indicated that his cause of death was exsanguination due to the wounds all over his body.

[¶7.] As law enforcement entered the apartment, Carlos awoke and began moving under the blankets on the bed. He attempted to sit up and told the officers

that "she said my nephew died[.]" He expressed alarm as he stepped out of the bed, and officers assisted him in getting out of the bed and into his wheelchair. Carlos stated that they had been drinking before he had fallen asleep, but at some point, he had heard Henry and Christopher "hollering" at each other. Carlos indicated that he heard Henry say, "[G]et up you stupid bitch," and also heard Christopher tell Henry to get out of the apartment using harsh and insulting terms. He believed that Henry had killed Christopher "[b]ecause they were trying to fight all three days."

[¶8.] Carlos related to law enforcement during a later interview that the couple was arguing because Christopher had told Henry to move out, and he further stated that before he fell asleep, Christopher had said, "You fucking bitch, get out of my house." Christopher had been telling Henry to get out for the previous two weeks. Carlos did not initially recall Henry yelling at Christopher but added that a week prior, she stated that she would kick his ass. Carlos also recalled Henry handing him a knife at some point during the night and telling him that she had stabbed Christopher with it. He threw it on the couch in response.

[¶9.] Shortly after officers arrived at the apartment, a crying Henry reappeared at the doorway, covered in blood. Henry was handcuffed and frisked. In the front pocket of her sweatshirt, law enforcement found a bloody box cutter with the blade exposed. Henry was distraught and speaking to herself as law enforcement transported her to the Hughes County Jail. Her PBT at booking indicated a blood alcohol content of 0.227%.

[¶10.] In the course of the investigation, law enforcement spoke to other individuals who knew Christopher and Henry. Violet Catches, Christopher's aunt, and Janell Mexican, his daughter, arrived on the scene upon learning of the police presence at the apartment building. Violet stated that Henry would have wanted to harm Christopher as she was "mean, and bossy to him[,]" would hit him, and accuse him of infidelity. Janell asserted that Christopher had called her the night before and stated that Henry would not stop hitting him. She heard Carlos in the background telling them to "knock it off." Janell believed that Henry often became physical with Christopher and that law enforcement had been called in the past to remove her from the premises. A neighbor named Ashley Scaresthehawk also noted to law enforcement that the couple had been on a drinking binge and fighting in the days leading up to the incident. She also witnessed a prior incident in which Henry had broken a neighbor's window and another time when Henry locked Christopher out of the apartment without any shoes.

[¶11.] Later on, law enforcement also spoke to Christopher Granados, one of Christopher's friends who viewed Christopher as a brother. Granados stated that the couple would fight, and Henry would hit Christopher. She would threaten to leave him for other men. Istoe Poorbear, another friend of Christopher's, related an incident that happened while they were drinking four or five years before Christopher's death. Poorbear stated that Henry glared at Christopher and told Poorbear that she should kill Christopher and go back to jail to be with her girlfriend. He also stated that they argued often, and Henry had been physically violent towards Christopher.

[¶12.] In the evening following her arrest, Henry waived her *Miranda* rights and agreed to speak with officers at the Hughes County Jail. She stated that she, Christopher, and Carlos had been drinking, and she "blanked out a couple of times." She recalled arguing with Christopher, that he threatened to kick her out, and that he was calling her names. She claimed that they eventually laid down on the floor next to each other, and she passed out. Henry recalled rousing a couple of times and speaking to Christopher. Upon awakening a further time and attempting to awaken Christopher, she realized that she was covered in blood and that Christopher was the source of the blood. She hit the floor with her fists, tried to wipe the blood off her, and attempted to wake up Carlos. Henry stated that she had no idea what had happened and wondered if she had done it. She looked at the couch and saw her knife, which she typically carried for self-defense.

[¶13.] At several points during the interview, Henry appeared to be speaking to individuals in the room who were not there. She indicated that Christopher's spirit was speaking with her, telling her that she had stabbed him.

[¶14.] On February 15, 2022, a Hughes County grand jury indicted Henry for second-degree murder. The State filed a part II habitual offender information, alleging prior felony convictions for grand theft, unauthorized ingestion of a controlled drug or substance, DUI 3rd offense, and DUI 4th offense. Henry moved for Dr. Stephen Manlove to be appointed "to determine her competency to assist in her defense and to proceed to trial and insanity at the time the offense was committed." The court granted her request.

[¶15.]     Dr. Manlove concluded that at the time of the crime, Henry had been suffering from alcohol-induced psychotic disorder, major depressive disorder, methamphetamine use disorder, alcohol use disorder, and cannabis use disorder. At the time of the evaluation, she continued to suffer from the same diagnoses, except that she no longer suffered from alcohol-induced psychotic disorder. Dr. Manlove determined that Henry was mentally competent to proceed. He noted some factors that tended to indicate that Henry was insane at the time of the crime, while others did not. Dr. Manlove concluded that overall, she was not insane as defined by codified law at the time of the crime. After the evaluation, Henry withdrew the issue of competency, and the court ordered that Henry was "mentally competent to understand the nature and consequences of the proceedings against her and to assist properly in her defense."

[¶16.]     Henry and the State entered into a plea agreement. The agreement provided that Henry would plead guilty to a one count information charging her with first-degree manslaughter involving domestic abuse.[1] The State agreed to dismiss the second-degree murder charge and the part II information. The State was free to make any recommendations at sentencing, and the parties agreed that sentencing remained the exclusive function of the court. The parties also filed a stipulated factual basis in support of the plea. The parties agreed that Henry and Christopher had been in a significant, on- and off-again, romantic relationship and had been living together at the Pierre Inn and Suites for several weeks before the killing. On the day of the killing, they had been drinking alcohol and arguing.

---

1.     Henry waived her right to a preliminary hearing on the information.

Henry agreed that she killed Christopher without any design to effect death by cutting him with a utility knife, and the killing was not justified. Court services completed a presentence investigation report that totaled approximately five hundred and fifty pages, including the police reports.

[¶17.] At the sentencing hearing in February 2023, Henry's counsel noted that Henry had had a difficult, unstable life. Shortly after she was born, she was raised by various family members until she came into the custody of the Department of Social Services as a teenager. She did not complete high school but eventually obtained her GED from Job Corps in Utah. Her attorney noted her four children who "have been taken away from her." Henry's history of alcohol and substance abuse issues was noted, as well as struggles with her psychiatric health, including several suicide attempts. Her attorney argued that Henry had no evidence of a support system in her life apart from Christopher.[2] He asserted that Henry had been honest with law enforcement, honest in her mental health evaluation, and expressed remorse. Henry herself recommended a penitentiary sentence of twenty-five to thirty years that her attorney supported.

[¶18.] The State emphasized the victim impact letters recounting that Christopher was a loving father who struggled with his own problems with alcohol. The State characterized Henry as a violent individual with prior domestic violence arrests. It remarked on law enforcement's observations during Henry's initial interrogation that her left hand had abrasions and swelling. The State

---

2. For instance, in a past presentence investigation report, Christopher wrote a letter of support for Henry.

acknowledged that Henry stated that it was her non-dominant hand and claimed to have hit it on the floor or the wall, but the State asserted that it did not "think a person would do that with their non-dominant hand. So [the State does not] agree with the fact that she's not a violent person." The State highlighted the ghastly nature of Christopher's death, which occurred for seemingly no reason. It remarked that Henry's past did not justify how she had acted and that "she's a danger to the community and has extremely low rehabilitative prospects." In addition, the State argued that the crime was committed while she was on parole, and she had received prior treatment "but clearly none of that stuck." The State emphasized that she consistently violated her parole by drinking leading up to the killing. To the State, Henry "demonstrated time and time again that she's not committed to sobriety, and she will continue to be a danger to the public." Although Henry stated that Christopher was the only one who took care of her, the State remarked, "She killed her support system." The State recommended a life sentence.

[¶19.] The court heard statements from two of Christopher's family members before it pronounced its sentence. The court indicated that it considered the presentence investigation report, the entire file, and the facts and circumstances of the matter. It noted that it gained familiarity with Henry's character and history, including her age of 39. It remarked on Henry's four previous felony convictions, noting that she did not have a significant violent history, although she had "previous charges for threatening law enforcement." The court cited her problems with alcohol abuse, including the fact she was in treatment at the time of the crime but had chosen to come to Pierre and abuse alcohol. It characterized her life as

"extremely sad and extremely disjointed." The court found that Henry removed a significant source of support by killing Christopher, and she demonstrated that she continued to commit crimes despite opportunities to rehabilitate herself when on probation and parole. The court noted Dr. Manlove's report and Henry's diagnosis of alcohol-induced psychoses, noting that "this is one of those situations where she was aware that being off her medications could contribute to that."[3]

[¶20.]       The court referenced the goals of sentencing, including retribution, deterrence, incapacitation, and rehabilitation. The court characterized the case as "tragic." It noted Henry's history of violence in reference to Christopher but that the reason for killing him "may never be known." The court referenced the gruesome nature of the crime, observing that it would have taken significant energy and anger to inflict someone with as many stab and slash wounds as Christopher suffered. The court acknowledged that Henry did not hide from law enforcement or attempt to conceal her crime.

[¶21.]       Based on the circumstances, including Henry's history, the extreme nature of the crime, her ongoing alcohol issues, previous opportunities at rehabilitation, the way the crime was discovered, and Henry's mental health issues, the court found "there is a need for a significant period of incapacitation." It remarked that there was "a very insignificant chance of rehabilitation" but stated

---

3.       Dr. Manlove's report included a summary of Henry's psychiatric history and diagnosis. Henry reported that in October 2021, Capital Area Counseling took her off her medication, and that two or three days later her auditory and visual hallucinations returned. Dr. Manlove noted that in a review of her medical records she had not been compliant with treatment. The court noted this lack of compliance at sentencing.

that there was a "sliver" and so did not impose a life sentence. The court sentenced Henry to seventy-five years with credit for time served, to be served consecutively to her DUI 4th offense.

[¶22.] Henry appeals, raising one issue: whether the circuit court abused its discretion in sentencing.

### Analysis

[¶23.] A sentencing court possesses broad discretion to prescribe punishment within statutory and constitutional limits. *State v. Deleon*, 2022 S.D. 21, ¶ 17, 973 N.W.2d 241, 246. A court may not impose a sentence outside the range of permissible choices—such a sentence is an abuse of discretion. *Id.* "Courts should consider the traditional sentencing factors of retribution, deterrence—both individual and general—rehabilitation, and incapacitation, without regarding any single factors as preeminent over the others." *Id.* (quoting *State v. Mitchell*, 2021 S.D. 46, ¶ 28, 963 N.W.2d 326, 333). The weight of these factors depends on the facts and circumstances of the case. *Id.*

[¶24.] Additionally, the court must consider the defendant's character and history "by studying the 'defendant's general moral character, mentality, habits, social environment, tendencies, age, aversion or inclination to commit crime, life, family, occupation, and previous criminal record.'" *Id.* ¶ 18 (quoting *Mitchell*, 2021 S.D. 46, ¶ 29, 963 N.W.2d at 333). The court must also examine "evidence tending to mitigate or aggravate the severity of a defendant's conduct and its impact on others." *Id.* Courts also may consider a broad range of evidence to learn about a defendant. *State v. McKinney*, 2005 S.D. 74, ¶ 17, 699 N.W.2d 460, 466. "Courts

may even consider conduct that was uncharged or served as the basis for charges that later resulted in a dismissal or acquittal as long as the State proves the conduct by a preponderance of the evidence." *Mitchell*, 2021 S.D. 46, ¶ 31, 963 N.W.2d at 333. A sentencing court abuses its discretion when it makes a "fundamental error of judgment, a choice outside the range of permissible choices . . . ." *State v. Rice*, 2016 S.D. 18, ¶ 23, 877 N.W.2d 75, 83 (quoting *MacKaben v. MacKaben*, 2015 S.D. 86, ¶ 9, 871 N.W.2d 617, 622).

[¶25.] First-degree manslaughter is a Class C felony that carries a maximum possible penalty of life imprisonment. SDCL 22-16-15; SDCL 22-6-1(3). Henry argues that the court abused its discretion by failing "to meet . . . sentencing standards." She argues that the court failed to properly weigh certain circumstances, including her unstable history, nonviolent criminal history, fact that she did not hide from law enforcement, history with alcohol abuse, her intoxication at the time of the offense, and her mental state at the time of the offense.

[¶26.] The court did not abuse its discretion in sentencing Henry. The court considered an extensive presentence investigation report prior to pronouncing its sentence. The report included a discussion of her past criminal history that did not include significant violence but did contain two dismissed charges for simple assault and a conviction for threatening a law enforcement officer. The court reviewed law enforcement reports, was aware of her age, and knew of her unstable past, substance abuse issues, extreme intoxication at the time of the offense, psychiatric conditions and treatment, and relationship with Christopher. The court considered the mental health evaluation Henry received, as well as the autopsy report

detailing Christopher's cause of death and pictures of his extensive injuries. Among the presentence investigation materials were victim impact statements from Christopher's family and past presentence investigation reports conducted for Henry.

[¶27.]    The court related the factors that it considered in pronouncing its sentence and determined that, in this case, incapacitation was the weightiest goal of Henry's punishment. It thoroughly examined the factors that Henry now contends it did not properly weigh and determined that based on the heinousness of the offense, her prior opportunities for treatment, and her demonstrated tendency to keep committing crimes, she deserved a seventy-five-year sentence. In contrast to Henry's arguments, the court did, in fact, consider other goals of punishment, including rehabilitation, and declined to pronounce a shorter sentence. No single goal of sentencing is entitled to greater weight than others—such weight depends on the circumstances of the case.

[¶28.]    Such a sentence was within the statutory maximum, and there is no indication that the sentence was outside the range of permissible choices. Henry's intoxication at the time of the crime and her unstable past do not excuse the extreme nature of Christopher's death. Furthermore, although Henry's sanity had been called into question, an expert determined that she was sane under the law at the time of the crime, and Henry declined to pursue the issue of her competency or insanity at the time of the crime. The court conducted a complete examination of Henry's character and the crime she committed and did not arrive at an impermissible conclusion.

#30301

[¶29.]     JENSEN, Chief Justice, and KERN, SALTER, DEVANEY, and MYREN, Justices, concur.