#30118-a-JMK
2023 S.D. 51

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                          Plaintiff and Appellee,

    v.

MITCH LEROY CAFFEE,                             Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
JERAULD COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE PATRICK T. PARDY
Judge

* * * *

DAVID K. WHEELER
ALYSSA HORN of
Blue, Wheeler & Banks, LLP
Huron, South Dakota                             Attorneys for defendant
                                                and appellant.


MARTY J. JACKLEY
Attorney General

PAUL S. SWEDLUND
Solicitor General
Pierre, South Dakota                            Attorneys for plaintiff
                                                and appellee.

* * * *

CONSIDERED ON BRIEFS
AUGUST 29, 2023
OPINION FILED **09/20/23**

#30118

KERN, Justice

[¶1.]	On October 24, 2021, while a no-contact order was in place, Mitch Caffee (Caffee), armed with a pistol, forced his way into the home where his wife, Katie Caffee (Katie), was staying with her ninety-year-old grandmother, Lorraine Redmann. Caffee had posted bond following a prior violation of the no-contact order just four days before. Once inside Redmann's home, he struck Katie and pushed her down onto a couch. When Redmann came out of her bedroom and tried to call 911, Caffee fatally shot her in the face. With Redmann lying dead on the floor, Caffee proceeded to hold Katie hostage in the home for hours while he contemplated his next steps. Caffee eventually surrendered and was arrested and charged with multiple offenses including first-degree murder. Pursuant to a plea agreement with the State, Caffee pleaded guilty to first-degree manslaughter, in violation of SDCL 22-16-15(3), and aggravated assault, in violation of SDCL 22-18-1.1(5). He was sentenced to life in prison without parole. Caffee appeals, arguing his sentence violates the Eighth Amendment and that the circuit court abused its discretion. We affirm.

## Factual and Procedural Background

[¶2.]	At the time of these events, Caffee and Katie resided in Wessington Springs, South Dakota. They had been together since 2011, were married in 2018, and had two children together.[1] While Caffee had no prior criminal convictions, Katie reported that Caffee was often physically violent toward her, going back to at

---

1.	Caffee had one prior marriage. His ex-wife, with whom he has a child, also reported a history of domestic violence against her.

-1-

least 2014. In 2016 or 2017, Caffee dragged Katie down a flight of stairs while she was pregnant with their son and slammed her head against the floor, injuring her. Caffee, in September 2017, shoved Katie in a bathroom, causing her to hit her face and chip a tooth, for which she needed dental care. On another occasion, in November 2020, Caffee hit Katie, and her employer noticed bruising on Katie's face while she was at work. Katie did not report this or any of the other assaults.

[¶3.] On August 31, 2021, Katie's friend called law enforcement after Katie disclosed to her that Caffee had beaten, kicked, and choked Katie in front of their seven-year-old daughter and three-year-old son. In a Child's Voice interview, the daughter recounted that Caffee grabbed Katie by the neck and threw her down when they were arguing. She was "[p]assed out on the ground, and he hit her with his foot on her head two times." Caffee dragged Katie to another room and eventually picked her up and put her on a bed. Her daughter reported that Katie vomited and had difficulty speaking when she woke up.

[¶4.] As a result of this incident, law enforcement arrested Caffee for domestic simple assault, and a no-contact order was put in place. Despite the existence of the no-contact order, Caffee was frequently at the family home. Then, on October 19, 2021, when Katie told Caffee that she "couldn't do it anymore[,]" he became angry and began searching the house for his pistol. On October 20, Katie called law enforcement to report the violation of the no-contact order. Caffee attempted to reach Katie throughout the day, asking her to share her GPS location with him. When she ignored his calls, he contacted her from another number. He

was arrested that evening for violation of the no-contact order and another domestic simple assault but bonded out the next morning.

[¶5.] After learning that Caffee had been released on bond, Katie began staying with Redmann because she was concerned for her own safety. Katie returned from work at 2:00 a.m. on October 24, 2021. She did not see anyone around when she parked her car and approached the house. After she entered the home, she closed and locked the door. A short time later she heard someone banging on the door and jiggling the door handle. She looked out the window and saw Caffee at the door attempting to open it. As she was checking the door to make sure she had locked it, Caffee kicked the door open and entered the home. He charged toward Katie, pushing her down onto a couch. Caffee struck her and yelled at her for turning him in to law enforcement for violating the no-contact order. Unbeknownst to Katie, Caffee was wearing a holstered gun at his side.

[¶6.] Hearing the commotion, Redmann woke up and came out of her bedroom. When she saw Caffee, she returned to her bedroom to retrieve her phone to call 911. Caffee followed her into the bedroom and confronted her, drawing a .40 caliber Glock Model 22C pistol. Katie heard a shot. Caffee came out of the room and said, "she's f***ing dead." Katie rushed toward the bedroom, but Caffee refused to let her into the room to check on her grandmother and brought her instead toward another bedroom. As she passed by her grandmother's room, she saw her lying on the floor and a lot of blood.[2] Caffee allowed Katie to call law enforcement

---

2. An autopsy later revealed that Redmann died of a single intermediate range gunshot wound to the face that perforated the brain.

to report what had happened. Katie was hysterical and sobbing on the phone with the 911 dispatcher and, at Caffee's direction, placed the call on speaker phone.

[¶7.]     Caffee spoke with the dispatcher, maintaining that he had "just wanted to talk" with Katie. At one point he told law enforcement that he had an explosive device and that if they entered the home he would "blow this whole f***ing house up just so you know." He told the dispatcher that he was not going to hurt Katie and had told her as much. Caffee explained that "her grandma f*****' interfered and I tried to swat her phone out of her hand and I accidentally shot her in the head."

[¶8.]     Caffee also called a news station and informed them that he had a story for them. He informed a reporter that there would be a police standoff at Redmann's residence and that they should send a news crew. Caffee reported killing his wife's grandmother and currently holding his wife hostage. When Katie asked Caffee why he called the news station, he said that he did so because "he just thought it would be fun[.]" He voiced contemplating suicide or suicide by cop. He also discussed finances with Katie and expressed that the kids needed a mother. Caffee kept Katie in the bedroom and would not allow her to leave, even accompanying her into the bathroom on the one occasion she asked to use it.

[¶9.]     A number of law enforcement agencies responded to the hostage situation. The Huron Police Department sent a Special Response Team, and the Highway Patrol sent a SWAT team and an armored vehicle. A trained negotiator and a sniper were deployed. Because Caffee told dispatch that he had an explosive device inside the house, law enforcement officers removed the occupants of two

homes near Redmann's residence. Negotiations with Caffee continued through the use of a hotline and by loudspeaker. After approximately six hours, Caffee left the pistol behind, and he and Katie walked out of the house together. Caffee was arrested and Katie was examined by medical personnel stationed at the scene.

[¶10.] On November 5, 2021, a grand jury indicted Caffee on eight counts: (1) murder in the first degree, in violation of SDCL 22-16-4(1), for Redmann's death; (2) murder in the first degree, in violation of SDCL 22-16-4(2), for Redmann's death; (3) kidnapping in the first degree, in violation of SDCL 22-19-1, with respect to Katie; (4) burglary in the first degree, in violation of SDCL 22-32-1(1); (5) aggravated assault (domestic violence), in violation of SDCL 22-18-1.1(5), with respect to Katie; (6) violation of no-contact order, in violation of SDCL 25-10-13, for committing the previously charged offense while a no-contact order was in place; and (7 and 8) two counts of commission of a felony while armed with firearm, in violation of SDCL 22-14-12, for committing kidnapping as charged in count (3) and violating a no-contact order as charged in count (6) while armed with a handgun. Caffee was arraigned on December 9, 2021. The court informed Caffee that the maximum sentence he could receive would be two death or mandatory life sentences, an additional life sentence, plus 92 years in the penitentiary, and fines up to $344,000. He pleaded not guilty on all counts.

[¶11.] On June 30, 2022, pursuant to an agreement with the State, Caffee pleaded guilty to both counts of an information charging him with first-degree manslaughter, in violation of SDCL 22-16-15(3), and aggravated assault, in violation of SDCL 22-18-1.1(5). Pursuant to the terms of the agreement, the State

stipulated that it would dismiss all the remaining charges and would not make a specific recommendation as to the length of an appropriate sentence, except to recommend that the sentences run concurrently. The State reserved the right to comment on the severity of the offenses.

[¶12.]     Prior to Caffee's sentencing hearing, he provided the court with a sentencing memorandum. The memorandum detailed a version of the facts similar to those set forth in his brief on appeal and included a report from Dave Lauck, a firearm expert who examined the gun. Lauck performed two strike tests and a stippling test[3] on the gun. He also opined that the gun was prone to accidental discharge. In addition, Caffee's sentencing memorandum included an attachment containing a list of the 94 manslaughter sentences imposed in the last ten years in South Dakota, only three of which were life sentences. Court services also prepared a pre-sentence investigation report, which included a report from the State's forensic expert showing that the gun was functioning properly as intended by the manufacturer.

[¶13.]     The sentencing hearing was held on August 17, 2022. Neither the State nor Caffee presented witnesses, but both the State and Caffee's counsel addressed the circuit court. Prior to imposing sentence, the court indicated that it

---

3.     In the context of this case, stippling or a stippling pattern refers to a grouping of dots caused by gunpowder discharged from a gun along with the bullet, which was the method Lauck used to form an opinion regarding the distance of the gunshot wound to Redmann. Lauck explained the procedure he used to perform this test in his report. First, he reviewed the medical examination finding that Redmann had a 3.25" by 3" area of stippling. Then he fired shots from the gun against white target paper from different distances until the area of the resulting stippling pattern was close to 3.25" by 3".

#30118

would articulate some of the factors it considered when attempting to fashion an

appropriate sentence, stating in part:

> So, first, in regards to the general moral character, mentality, and tendencies of the Defendant, you are an aggressive abuser with a long history of controlling and abusing your partner. There is a history going back to at least 2014 of kicking, punching, pushing, strangulation, to the point of your victim passing out.
> . . .
> In this matter, the Defendant was arrested on a simple assault, domestic, on August 31st, 2021. Got out on bond, with conditions. Was arrested for violating those conditions.
>
> After posting a second bond, got out again. Ignored the law. Ignored your bond conditions. Got a gun, broke into [Redmann's] home, shot and killed her. In your brief, you claim this was an accident, and you blame the gun.
>
> The fact is, in this matter, you brought the gun, you kicked through a locked door, and then you attacked the victim in her house. You unholstered your gun, you put your finger on the trigger. Your excuse is that you were hitting the phone out of her hand because she was calling for help, after you broke into her home, after you attacked her, terrorized her granddaughter. I find all of this behavior shows that you will knowingly commit any crime to get what you want.
> . . .
> When I look at the effects of your crime on your victims, first, regarding [Redmann], you obviously took all she's had -- all she had and all she'll ever have. You deprived her family and friends of her love, her companionship, leaving a crater, really, in all of their lives. It appears from the record to this [c]ourt that she was a textbook grandmother that we think of, cornerstone of a family, family gatherings, and you destroyed that.
>
> Regarding [Katie], she suffered under your abuse and terrorization for years. The damage you have done to her and your children can never be undone, and no amount of counseling will undo that.
>
> This [c]ourt studied all of the factors that I am required to study or consider. Without discarding any of the factors, the factors that weighed most heavily on me is your lack of moral character

-7-

and evil mentality. In the kitchen of your wife's home, in your home, in front of your eight-year-old daughter and her little brother, you assaulted their mother as they screamed and cried, and you choked her until she passed out. Then in front of your children, you kicked her in the head, I'm assuming to see if she was still alive. And then you dragged her to another room because you couldn't physically pick her up.

Looking at your allegation, or your position that this was an accident: You intentionally violated the bond. You intentionally tracked your wife to a home. Before that, you intentionally went and got a gun. You intentionally loaded that gun. You intentionally broke into the house. You intentionally pushed your wife on the ground. When she got up, you intentionally hit her to the ground. You intentionally confronted [Redmann.] You intentionally pulled the gun, apparently, at that point, to which even your own attorney has acknowledged. You intentionally put your finger on the trigger of that gun. And whether or not you intentionally shot her or you were intentionally pistol-whipping a phone out of her hand really doesn't matter. She is dead simply because of your intentional actions.

With that, the court sentenced Caffee to life without the possibility of parole for first-degree manslaughter and to a term of fifteen years for aggravated assault to run concurrently with his life sentence. The court ordered Caffee to pay restitution and forbade him to initiate contact with Redmann's family, Katie, or their children.

[¶14.] Caffee raises two issues on appeal, which we restate as follows:

1.  Whether Caffee's sentence constitutes cruel and unusual punishment.

2.  Whether the circuit court abused its discretion by imposing a life sentence without the possibility of parole.

## Analysis

[¶15.] Because Caffee challenges his life sentence for first-degree manslaughter and not his sentence to a term of years for aggravated assault, we restrict our analysis to the crime of first-degree manslaughter and the punishment

therefor.  Caffee challenges his life sentence as both unconstitutional and an abuse of discretion.  We consider these issues in turn under the applicable standards of review.

### 1. Whether Caffee's sentence constitutes cruel and unusual punishment.

[¶16.]     "[W]hen the question presented is whether a challenged sentence is cruel and unusual in violation of the Eighth Amendment, we conduct a de novo review."  *State v. Manning*, 2023 S.D. 7, ¶ 47, 985 N.W.2d 743, 757 (alteration in original) (quoting *State v. Chipps*, 2016 S.D. 8, ¶ 31, 874 N.W.2d 475, 486).  "The Eighth Amendment to the United States Constitution prohibits 'cruel and unusual punishment[.]'"  *Id.* (alteration in original) (quoting U.S. Const. amend. VIII).  "This restriction applies to the states through the Fourteenth Amendment."  *Id.*

[¶17.]     "In determining whether a noncapital sentence is in violation of the Eighth Amendment, we must decide whether the sentence is 'grossly disproportionate to its corresponding offense.'"  *Id.* ¶ 48, 985 N.W.2d at 757 (quoting *State v. Rice*, 2016 S.D. 18, ¶ 13, 877 N.W.2d 75, 80).  "To do so, we first compare the gravity of the offense—i.e., 'the offense's relative position on the spectrum of all criminality'—to the harshness of the penalty—i.e., 'the penalty's relative position on the spectrum of all permitted punishments.'"  *Id.* (quoting *Rice*, 2016 S.D. 18, ¶ 13, 877 N.W.2d at 80).  "This analysis will 'typically mark[ ] the end of our review' as gross disproportionality is rarely found."  *Id.* (alteration in original) (quoting *Chipps*, 2016 S.D. 8, ¶ 38, 874 N.W.2d at 489).  If the penalty does appear "to be grossly disproportionate to the gravity of the offense, then we will compare the sentence to those 'imposed on other criminals in the same jurisdiction' as well as

those 'imposed for commission of the same crime in other jurisdictions.'" *Id.* ¶ 48, 985 N.W.2d at 758 (quoting *Chipps*, 2016 S.D. 8, ¶ 38, 874 N.W.2d at 489).

[¶18.] We examine the gravity of the offense first. Caffee was convicted of first-degree manslaughter for perpetrating homicide "[w]ithout any design to effect death, . . . but by means of a dangerous weapon[.]" SDCL 22-16-15(3). "[H]omicide has long been considered 'the highest crime against the law of nature, that man is capable of committing.'" *State v. Ceplecha*, 2020 S.D. 11, ¶ 59, 940 N.W.2d 682, 698 (alteration in original) (quoting *Rice*, 2016 S.D. 18, ¶ 14, 877 N.W.2d at 80). "[T]he consequences of taking a life are not simply grievous, they are incalculable[.]" *Id.* (second alteration in original).

[¶19.] In addition to considering the gravity of the offense in the abstract, "the circumstances of the crime of conviction affect the gravity of the offense." *Chipps*, 2016 S.D. 8, ¶ 36, 874 N.W.2d at 488. And "[i]n conducting the threshold comparison between the crime and the sentence, we also consider other conduct relevant to the crime." *Id.* ¶ 40, 874 N.W.2d at 490 (quoting *State v. Garreau*, 2015 S.D. 36, ¶ 12, 864 N.W.2d 771, 776). When the undisputed facts of a case establish that a defendant had greater involvement in a crime than reflected in their plea to a lesser charge, the circuit court in imposing sentence can consider the true nature of the offense and whether it was "among 'the more serious commissions of the crime[.]'" *State v. Klinetobe*, 2021 S.D. 24, ¶ 43, 958 N.W.2d 734, 744 (alteration in original) (quoting *State v. Talla*, 2017 S.D. 34, ¶ 10, 897 N.W.2d 351, 354).

[¶20.] Caffee acknowledges that first-degree manslaughter is a grave offense but argues that he did not commit the crime in a particularly callous way. He

argues, referencing the report from his firearm expert, that the amount of movement needed to pull the trigger of his pistol was reduced and that he was only trying to use the gun to knock the phone from Redmann's hand when it discharged. He contends that the results of the stippling test performed by his expert are consistent with his story that he shot Redmann at a distance of approximately ten inches. Caffee claims he lacked motive, which in turn supports his contention that there was no premeditation, because he had nothing to gain from killing either Katie or Redmann. Further, he claims he always intended to take responsibility and just needed time to figure out how to end the situation.

[¶21.] In response to Caffee's claim about the pistol being prone to accidental discharge, the State notes that "abnormally slight pressure on the trigger" still involves an admission "that Caffee's finger was on the trigger which is evidence of premeditation." Moreover, according to the State forensic expert's report, the pistol was fully functional. The State also contends, and the record supports, that while Caffee pleaded to the reduced charge of manslaughter, there was sufficient evidence to qualify Caffee's actions as first-degree murder. Thus, in the State's estimation, "Caffee's conduct is grave in the extreme on the spectrum of criminality."

[¶22.] In this case, although Caffee had no prior convictions, the particular circumstances surrounding this crime do not lessen its gravity. First, Caffee broke into Redmann's home at night. Then, he was violent toward her granddaughter— who was staying there specifically because he had already violated a no-contact order and she no longer felt safe in her own home. Finally, Caffee admits that it was his intent to use his pistol to knock the phone out of the ninety-year-old

woman's hand, which he did with his finger on the trigger of the loaded firearm. On the spectrum of all criminality, therefore, the gravity of Caffee's crime is high.

[¶23.]    We next examine the harshness of the sentence. The circuit court sentenced Caffee to life imprisonment without the possibility of parole. First-degree manslaughter is a Class C felony. SDCL 22-16-15. The maximum penalty authorized for a Class C felony is "life imprisonment in a state correctional facility. In addition, a fine of fifty thousand dollars may be imposed[.]" SDCL 22-6-1(3). The spectrum of all permitted punishments in South Dakota includes the possibility of death. *See* SDCL 22-6-1(1) (authorizing death as a penalty for a Class A felony).

[¶24.]    Caffee argues this Court should determine that the penalty is grossly disproportionate to the offense because the circuit court imposed a life sentence without a finding that the crime was committed intentionally. In Caffee's view, "[a] crime in which a person uses a gun to intimidate a person and control a situation and then accidently kills another person does not match the harshness of the penalty imposed by the trial court." He seeks a remand "for an analysis of the sentence compared to other sentences in this state and compared to other sentences for the same crime in other states."

[¶25.]    With only a death sentence above it, a life sentence is undoubtedly at the higher end of the spectrum of all permitted punishments. The baseline gravity of first-degree manslaughter is likewise high. *See Rice*, 2016 S.D. 18, ¶ 14, 877 N.W.2d at 80. We also consider Caffee's conduct surrounding the crime and that his conviction reflects a plea bargain agreement resulting in dismissal of the first-degree murder charges levied against him by the grand jury. *See Chipps*, 2016 S.D.

8, ¶ 36, 874 N.W.2d at 488. The circuit court described Caffee's intentional conduct in shooting Redmann in the face, which is among the most serious commissions of this offense. Thus, when compared to the gravity of Caffee's offense, his punishment is not grossly disproportionate, and our review of his constitutional claim ends.

### 2. Whether the circuit court abused its discretion by imposing a life sentence without the possibility of parole.

[¶26.] "We generally review a circuit court's sentencing decision for an abuse of discretion." *Manning*, 2023 S.D. 7, ¶ 51, 985 N.W.2d at 758 (quoting *Klinetobe*, 2021 S.D. 24, ¶ 26, 958 N.W.2d at 740). "An abuse of discretion is a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on full consideration, is arbitrary or unreasonable." *Id.* (quoting *Klinetobe*, 2021 S.D. 24, ¶ 26, 958 N.W.2d at 740).

[¶27.] "Circuit courts have broad discretion in sentencing." *Id.* ¶ 52, 985 N.W.2d at 758 (quoting *Klinetobe*, 2021 S.D. 24, ¶ 28, 958 N.W.2d at 741). "Courts should consider the traditional sentencing factors of retribution, deterrence—both individual and general—rehabilitation, and incapacitation." *Klinetobe*, 2021 S.D. 24, ¶ 28, 958 N.W.2d at 741. Courts should weigh these factors "on a case-by-case basis[.]" *Id.* (quoting *State v. Toavs*, 2017 S.D. 93, ¶ 10, 906 N.W.2d 354, 357). Courts may determine "which theory is accorded priority" in a particular case. *Talla*, 2017 S.D. 34, ¶ 14, 897 N.W.2d at 355. "[T]he sentencing court should acquire a thorough acquaintance with the character and history of the [person] before it[,]" and "should have access to 'the fullest information possible concerning

the defendant's life and characteristics. Information which should be available to the court includes general moral character, mentality, habits, social environment, tendencies, age, aversion or inclination to commit crime, life, family, occupation, and previous criminal record.'" *Klinetobe*, 2021 S.D. 24, ¶ 29, 958 N.W.2d at 741 (internal citations omitted) (quoting *State v. Holler*, 2020 S.D. 28, ¶ 18, 944 N.W.2d 339, 344).

[¶28.] We have said that "circuit courts must look at both the person before them and the nature and impact of the offense." *State v. Mitchell*, 2021 S.D. 46, ¶ 29, 963 N.W.2d 326, 333. Circuit "courts must consider sentencing evidence tending to mitigate or aggravate the severity of a defendant's conduct and its impact on others. Sentencing courts are often required, in this regard, to accurately assess the 'true nature of the offense.'" *Id.* ¶ 30, 963 N.W.2d at 333 (quoting *Klinetobe*, 2021 S.D. 24, ¶ 36, 958 N.W.2d at 742). This may include "conduct that was uncharged or served as the basis for charges that later resulted in a dismissal . . . as long as the State proves the conduct by a preponderance of the evidence." *Id.* ¶ 31, 963 N.W.2d at 333. Thus, "a circuit court can accept [a] reduced manslaughter plea as provident and still rely upon additional evidence adduced at sentencing to determine the actual level of culpability in order to formulate an appropriate sentence." *Id.* ¶ 32 n.7, 963 N.W.2d at 333 n.7. We have upheld a circuit court's reliance on "an 'extensive sentencing record' to assess the nature of a defendant's offense . . . not limited to the information contained in a stipulated factual basis statement used to support a defendant's guilty plea." *Id.* ¶ 32, 963 N.W.2d at 333 (quoting *Klinetobe*, 2021 S.D. 24, ¶ 36 n.6, 958 N.W.2d at 742 n.6).

[¶29.] Caffee argues that "[t]he sentencing court disregarded any chance for rehabilitation" because a life sentence is inconsistent with the goal of rehabilitation. *See State v. Ramos*, 1996 S.D. 37, ¶ 17, 545 N.W.2d 817, 821. He points to his lack of prior criminal convictions and how the pending simple assault charge was his first such charge. Caffee asserts that the court determined that he was incapable of rehabilitation based on his history of domestic violence when there was "no evidence that counseling and appropriate domestic violence programming would have no effect on him." He contends that the court should not have ruled out rehabilitation in his case because he had never been through the criminal justice system and it was thus unknown whether mental health counseling, domestic abuse courses, and incarceration would have had a rehabilitative effect upon him. Caffee argues that courts should reserve life sentences for those criminals who "have shown a propensity through their prior criminal history to be incapable of change after being held accountable for their actions." He seeks a remand for resentencing.

[¶30.] The State argues that rehabilitation is not preeminent over the other goals of incarceration and should be considered co-equal with retribution, deterrence, and incapacitation. *See Talla*, 2017 S.D. 34, ¶ 14, 897 N.W.2d at 355. The State further contends that Caffee should have been motivated to seek rehabilitation long before killing Redmann because of the destructive impact his abusive actions had on Katie.[4]

[¶31.] At sentencing, the State challenged the utility of the memorandum Caffee submitted showing the range of sentences received in other South Dakota

---

4. The State also points to the harm he inflicted on his ex-wife.

first-degree manslaughter cases given the fact-intensive nature of sentencing. The State reiterates that Caffee's manslaughter conviction "significantly understates his actual criminal culpability" when he could have been convicted of first-degree murder, which is punishable by death or a mandatory life sentence. The State argues it was appropriate for the court to accord more relative weight to incapacitation because of the risk Caffee poses to women.

[¶32.] The State also disputed Caffee's claim that the shooting was an accident and argued to the court "that that gun was working fine. It had three safety mechanisms, all of which were functioning as the manufacturer had intended them."[5] The State further noted that Caffee was not known to carry his gun and that he had been looking for it days prior to the incident. Bringing a gun, the State insists, is inconsistent with his claim that he just wanted to talk.

[¶33.] Our review does not lead us to conclude that the circuit court abused its discretion in sentencing Caffee. When the court fashioned Caffee's sentence, it had both his memorandum and the pre-sentence investigation report before it. The court's findings reflect that the court was well-informed about Caffee's character and history, including his mentality, habits, social environment, tendencies, age, aversion or inclination to commit crime, life, family, occupation, and previous criminal record. *See Klinetobe*, 2021 S.D. 24, ¶ 29, 958 N.W.2d at 741. At sentencing, the court explained that "[w]hen I look at your age, your life, your

---

5. The fact that Caffee's expert suggested the gun, or at least the model, had a tendency to misfire created a conflict in the evidence which the circuit court was uniquely positioned to resolve. *See State v. Klinetobe*, 2021 S.D. 24, ¶ 35, 958 N.W.2d 734, 742 (holding the sentencing court "was not obligated to indiscriminately accept the expert testimony" presented by the defendant).

family, your occupation, it provides no excuse. And the record is clear that you are a 39-year-old man, you were set as a landowner, had a wife, children. You had resources, opportunity, the career you wanted, and a family."

[¶34.]      Turning to the true nature of the crime, the evidence supports that the State could have pursued a first-degree murder conviction given the circumstances under which Caffee entered Redmann's home before killing her and the manner in which he shot her. *See* SDCL 22-16-4(1). The record supports the first-degree murder (felony murder) charge levied against Caffee, in that Redmann was killed while Caffee was engaged in the perpetration of burglary and kidnapping. *See* SDCL 22-16-4(2).

[¶35.]      Contrary to Caffee's argument that the court disregarded his prospects for rehabilitation, the record reveals that the court specifically "considered" the traditional sentencing factors.[6] *See Klinetobe*, 2021 S.D. 24, ¶ 28, 958 N.W.2d at 741. In fact, the court explicitly discussed why it did not think rehabilitation would be successful: "[w]hen I look at rehabilitation and the prospects for you, I frankly don't find much redeeming about your history that would lead this [c]ourt to believe that your rehabilitation prospects are good. The fact is that your violence towards women, with a history of abuse and terrorizing your wife, choking a domestic partner to the point of blackout, is a serious red flag for future violence. And I do believe that you will always be a danger to the women in your life." The court was

---

6.      The court reviewed and considered numerous letters from Caffee's victims, noting: "I have received every letter that was in the report, and I have studied them all." The letters detail the fear and hurt Caffee caused Redmann's family and friends and support a sentence placing great weight on retribution and incarceration.

within its discretion to determine that, on the facts of this case, Caffee's rehabilitation was not a factor the court could accommodate without jeopardizing the safety and well-being of the community. *See Talla*, 2017 S.D. 34, ¶ 14, 897 N.W.2d at 355.

[¶36.]     Caffee does not point to anything the court failed to consider—he simply disagrees with how the court weighed the factors it considered. Our review of the record shows that there were ample aggravating factors to support affirmance of the court's decision to impose a life sentence without the possibility of parole.

[¶37.]     Affirmed.

[¶38.]     JENSEN, Chief Justice, and SALTER, DEVANEY, and MYREN, Justices, concur.