#30663-a-SPM
**2024 S.D. 77**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

    v.

QUINCY MAURCE BEAR ROBE,                    Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE JOSHUA HENDRICKSON
Judge

\* \* \* \*

JOHN R. MURPHY
Rapid City, South Dakota          Attorney for defendant and
appellant.


MARTY J. JACKLEY
Attorney General

PAUL S. SWEDLUND
Solicitor General
Pierre, South Dakota          Attorneys for plaintiff and
appellee.

\* \* \* \*

CONSIDERED ON BRIEFS
SEPTEMBER 30, 2024
OPINION FILED **12/11/24**

#30663

MYREN, Justice

[¶1.] Quincy Bear Robe was convicted of first-degree manslaughter and sentenced to 75 years in the penitentiary. On appeal, he contends the circuit court abused its discretion when imposing that sentence and that the sentence was cruel and unusual in violation of the Eighth Amendment of the United States Constitution. We affirm.

## Factual and Procedural Background

[¶2.] In the early morning of March 19, 2022, Quincy Bear Robe, his girlfriend Shayla Bravo, and several of Bravo's friends convened in a room at the Grand Gateway Hotel. At some point in those early morning hours, Myron Pourier and his friends arrived at the hotel and entered the same room, although they were not invited.

[¶3.] An altercation between the groups ensued, during which Bear Robe and Isaac Runningshield discharged their guns. Pourier died from two .40 caliber gunshot wounds he received during the confrontation. A few minutes after the shooting, law enforcement found Bear Robe near the Grand Gateway Hotel with a .40 caliber semi-automatic handgun in his possession.

[¶4.] After being detained in the back of the patrol car, Bear Robe took out his phone, called a friend, and bragged that he "caught a body" and that he and Runningshield "popped a nigga." When asked why he shot Pourier, Bear Robe told his friend, "'cause the nigga got in my face talking shit, bro." Bear Robe said he fired his gun twice, and he thought one shot hit Pourier in the head. Bear Robe told his friend he was caught with the gun his friend gave him.

-1-

[¶5.]     On April 6, 2022, three days after Pourier's death, Bear Robe was indicted and charged with second-degree murder (SDCL 22-16-7) and the commission of a felony with a firearm (SDCL 22-14-12). On August 10, 2022, a grand jury issued a superseding indictment, adding a charge of first-degree murder (SDCL 22-16-4(1)). Bear Robe accepted a plea agreement to plead guilty to first-degree manslaughter (SDCL 22-16-15(3)) in exchange for the State requesting a prison sentence of 75 years with ten years suspended.

[¶6.]     On October 23, 2023, the circuit court accepted Bear Robe's guilty plea and ordered a presentence investigation report (PSI). The PSI stated Bear Robe had no prior criminal record but said he was charged with simple assault in a mutual combat situation while in jail awaiting trial in this case. The PSI noted Bear Robe's young age and highlighted several mitigating factors from Bear Robe's childhood. It also noted that Bear Robe grew up in a chaotic home environment, was raised by various family members in multiple different communities, and attended ten different schools. The PSI detailed the mental, physical, and emotional abuse Bear Robe experienced as a child.

[¶7.]     Additionally, he experienced mental health conditions and was medicated for a variety of issues, including ADHD, anxiety, depression, and post-traumatic stress disorder. Bear Robe obtained counseling because of many suicide attempts. The PSI listed other mitigating factors, like Bear Robe being remorseful, acknowledging he needed treatment, and stating he would do whatever the court asked of him to become a better person.

[¶8.] Various family, friends, and community members wrote letters on his behalf stating that he was a good person. His family members said he was a protective, dedicated, honest, caring, and goal-oriented person. His high school principal and counselor wrote letters stating he was a good student, was on track to graduate in May, was a leader, and was never aggressive or threatening, though he could be impulsive. Three workers from the Rapid City Club for Boys characterized Bear Robe as a young man of unusually good character, a fine man, and one of the last people they thought would be in this trouble.

[¶9.] On February 26, 2024, the circuit court sentenced Bear Robe to 75 years in the penitentiary with no time suspended. The circuit court explained:

> But the way the Court sees this action and the factors I consider in the mitigation are the Defendant's age and being young himself, 19 at the time of the offense, and the lack of a criminal history as just described by defense counsel, that's the [mitigation] I look at. And the factors in aggravation essentially are, the death of the victim; a senseless act of violence; intoxication and possessing a gun in that manner, simply put, the way I see this, in our society today there's been a shocking casual escalation in these types of situations where young people are involved with alcohol and guns and it can't be tolerated. Any time we see this as purely a deterrent effect, I have to look at that and send a strong message that this isn't tolerated.
>
> You did plead guilty to a manslaughter charge, and I do believe a lengthy penitentiary sentence is appropriate here. The State has recommended 75 years with ten suspended. I understand your argument. I have contemplated that seriously, and it's going to be the judgment of the Court that you be sentenced to a 75 year penitentiary sentence. I'm not going to suspend any time.*

---

* The circuit court gave Bear Robe credit for the 710 days served in jail awaiting the trial.

[¶10.]     Bear Robe appeals and raises two issues regarding his sentence:

1.    Whether the circuit court abused its discretion when it imposed the sentence.

2.    Whether the sentence was a cruel and unusual punishment under the Eighth Amendment of the United States Constitution.

### Decision

### *1.     Whether the circuit court abused its discretion when it imposed the sentence.*

[¶11.]     "We generally review a circuit court's sentencing decision for an abuse of discretion." *State v. Manning*, 2023 S.D. 7, ¶ 51, 985 N.W.2d 743, 758 (quoting *State v. Klinetobe*, 2021 S.D. 24, ¶ 26, 958 N.W.2d 734, 740). "An abuse of discretion is a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on full consideration, is arbitrary or unreasonable." *Id.* (quoting *Klinetobe*, 2021 S.D. 24, ¶ 26, 958 N.W.2d at 740).

[¶12.]     "Circuit courts have broad discretion in sentencing." *Id.* ¶ 52, 985 N.W.2d at 758 (quoting *Klinetobe*, 2021 S.D. 24, ¶ 28, 958 N.W.2d at 741). "We have said that 'circuit courts must look at both the person before them and the nature and impact of the offense.'" *State v. Caffee*, 2023 S.D. 51, ¶ 28, 996 N.W.2d 351, 360 (quoting *State v. Mitchell*, 2021 S.D. 46, ¶ 29, 963 N.W.2d 326, 333). "[T]he sentencing court should acquire a thorough acquaintance with the character and history of the [person] before it[,]" and "should have access to 'the fullest information possible concerning the defendant's life and characteristics. Information which should be available to the court includes general moral character, mentality, habits, social environment, tendencies, age, aversion or

inclination to commit crime, life, family, occupation, and previous criminal record.'"

*Klinetobe*, 2021 S.D. 24, ¶ 29, 958 N.W.2d at 741 (internal citations omitted) (quoting *State v. Holler*, 2020 S.D. 28, ¶ 18, 944 N.W.2d 339, 344).

[¶13.] "Circuit 'courts must consider sentencing evidence tending to mitigate or aggravate the severity of a defendant's conduct and its impact on others. Sentencing courts are often required, in this regard, to accurately assess the 'true nature of the offense.'" *Caffee*, 2023 S.D. 51, ¶ 28, 996 N.W.2d at 360 (citation omitted). "[A] circuit court can accept [a] reduced manslaughter plea as provident and still rely upon additional evidence adduced at sentencing to determine the actual level of culpability in order to formulate an appropriate sentence." *Mitchell*, 2021 S.D. 46, ¶ 32 n.7, 963 N.W.2d at 333 n.7. Circuit courts are allowed to rely on "an 'extensive sentencing record' to assess the nature of a defendant's offense . . . not limited to the information contained in a stipulated factual basis statement used to support a defendant's guilty plea." *Id.* ¶ 32, 963 N.W.2d at 333 (quoting *Klinetobe*, 2021 S.D. 24, ¶ 36 n.6, 958 N.W.2d at 742 n.6).

[¶14.] Bear Robe argues that the circuit court sentenced him almost exclusively based on the general deterrence consideration and disregarded mitigating evidence. Bear Robe also disagrees with how much weight each factor was given. Bear Robe additionally contends the circuit court sentenced him as part of a class rather than as an individual.

[¶15.] "Courts should consider the traditional sentencing factors of retribution, deterrence—both individual and general—rehabilitation, and incapacitation." *Klinetobe*, 2021 S.D. 24, ¶ 28, 958 N.W.2d at 741. "Courts should

weigh these factors 'on a case-by-case basis[.]'" *Caffee*, 2023 S.D. 51, ¶ 27, 996 N.W.2d at 360 (alteration in original) (citation omitted). "Courts may determine 'which theory is accorded priority' in a particular case." *Id.* (quoting *State v. Talla*, 2017 S.D. 34, ¶ 14, 897 N.W.2d 351, 355).

[¶16.]     The circuit court acquired a thorough acquaintance with Bear Robe's character and history, including information concerning his life and characteristics. It read the PSI, demonstrated a familiarity with the case, and was presented with aggravating and mitigating evidence. The circuit court stated, "I have reviewed this case thoroughly and everything that is contained in the Court file and the numerous victim's letters that have been provided prior to sentencing" and, "I understand your argument. I have contemplated that seriously[.]" The circuit court was well-informed about Bear Robe's character and history, including his mentality, habits, social environment, tendencies, age, aversion or inclination to commit crime, life, family, occupation, and previous criminal record. *See Caffee*, 2023 S.D. 51, ¶ 33, 996 N.W.2d at 361. The record establishes the circuit court was properly oriented to the appropriate considerations, even though it did not explicitly address each one. We have never required detailed findings of fact to justify a sentence. *See State v. Deleon*, 2022 S.D. 21, ¶ 24, 973 N.W.2d 241, 247 (citation omitted).

[¶17.]     In addition to claiming the circuit court did not address rehabilitation and other theories, Bear Robe disagrees with how much weight the factors were given. It is the sentencing court's responsibility to determine how much weight each factor is given. *Caffee*, 2023 S.D. 51, ¶ 27, 996 N.W.2d at 360 (quoting *Talla*,

2017 S.D. 34, ¶ 14, 897 N.W.2d at 355). Here, the circuit court determined general deterrence was a significant consideration.

[¶18.] Bear Robe's third argument is also unavailing. It relies on the inaccurate premise that the circuit court sentenced him as part of a class rather than as an individual. However, a review of the circuit court's remarks reveals that it analyzed characteristics specific to Bear Robe when it assessed the level of risk he posed to the community. The circuit court noted Bear Robe's youth, intoxication, and possession of a firearm. These factors, when seen in combination, informed the circuit court's assessment that Bear Robe presented a risk to public safety.

[¶19.] Lastly, while the circuit court imposed a lengthy sentence, the sentence "was within the range of permissible choices." *Deleon*, 2022 S.D. 21, ¶ 25, 973 N.W.2d at 247. The circuit court acquired a thorough understanding of Bear Robe and his history, was oriented to the appropriate considerations, and imposed a sentence within the permissible range. It did not abuse its discretion.

> **2.** *Whether the sentence was a cruel and unusual punishment under the Eighth Amendment of the United States Constitution.*

[¶20.] "[W]hen the question presented is whether a challenged sentence is cruel and unusual in violation of the Eighth Amendment, we conduct a de novo review." *Caffee*, 2023 S.D. 51, ¶ 16, 996 N.W.2d at 357–58 (alteration in original) (quoting *Manning*, 2023 S.D. 7, ¶ 47, 985 N.W.2d at 757). "The Eighth Amendment to the United States Constitution prohibits 'cruel and unusual punishment[.]'" *Id.* ¶ 16, 996 N.W.2d at 358 (quoting U.S. Const. amend. VIII). "This restriction applies to the states through the Fourteenth Amendment." *Id.* (citation omitted).

[¶21.] "In determining whether a noncapital sentence is in violation of the Eighth Amendment, we must decide whether the sentence is 'grossly disproportionate to its corresponding offense.'" *Id.* ¶ 17 (quoting *Manning*, 2023 S.D. 7, ¶ 48, 985 N.W.2d at 757). "To do so, we first compare the gravity of the offense—i.e., 'the offense's relative position on the spectrum of all criminality'—to the harshness of the penalty—i.e., 'the penalty's relative position on the spectrum of all permitted punishments.'" *Id.* (citation omitted). "This analysis will 'typically mark[ ] the end of our review' as gross disproportionality is rarely found." *Id.* (alteration in original) (citation omitted). "If the penalty does appear 'to be grossly disproportionate to the gravity of the offense, then we will compare the sentence to those "imposed on other criminals in the same jurisdiction" as well as those "imposed for commission of the same crime in other jurisdictions."'" *Id.* (quoting *Manning*, 2023 S.D. 7, ¶ 48, 985 N.W.2d at 758).

[¶22.] Bear Robe was convicted of first-degree manslaughter for perpetrating homicide "[w]ithout any design to effect death, . . . but by means of a dangerous weapon[.]" SDCL 22-16-15(3). "[H]omicide has long been considered 'the highest crime against the law of nature, that man is capable of committing.'" *State v. Ceplecha*, 2020 S.D. 11, ¶ 59, 940 N.W.2d 682, 698 (alteration in original) (quoting *State v. Rice*, 2016 S.D. 18, ¶ 14, 877 N.W.2d 75, 80). While Bear Robe was not convicted of murder, "manslaughter nevertheless involves the unjustified killing of another human being." *Id.* "[T]he consequences of taking a life are not simply grievous, they are incalculable[.]" *Id.* (second alteration in original).

[¶23.] First-degree manslaughter is a Class C felony with a maximum penalty of "life imprisonment in a state correctional facility. In addition, a fine of fifty thousand dollars may be imposed[.]" SDCL 22-6-1(3). On the scale of the nine felony classes in SDCL 22-6-1 (six numbered classes and three lettered classes), a Class C felony is the third highest in the range of all permitted punishments. Bear Robe received a sentence of 75 years, which is well within the authorized range of sentence. Considering the gravity of the crime of first-degree manslaughter, a 75-year sentence is not grossly disproportionate. *See Rice*, 2016 S.D. 18, ¶ 15, 877 N.W.2d at 81. "If the threshold requirement of gross disproportionality is not met, the analysis under the Eighth Amendment ends." *State v. Traversie*, 2016 S.D. 19, ¶ 15, 877 N.W.2d 327, 332.

### Conclusion

[¶24.] The circuit court did not abuse its discretion in imposing a 75-year sentence on Bear Robe, nor was the sentence cruel and unusual in violation of the Eighth Amendment of the United States Constitution. We affirm.

[¶25.] JENSEN, Chief Justice, and KERN, SALTER, and DEVANEY, Justices, concur.