#30404-a-JMK
**2024 S.D. 26**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                          Plaintiff and Appellee,

   v.

JAMES JOSEPH LANPHER, JR.,                      Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
LAKE COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE PATRICK T. PARDY
Judge

* * * *

CODY J. MILLER of
Lammers, Kleibacker,
   Dawson & Miller, LLP
Madison, South Dakota                           Attorneys for defendant
                                                and appellant.


MARTY J. JACKLEY
Attorney General

ERIN E. HANDKE
Assistant Attorney General
Pierre, South Dakota                            Attorneys for plaintiff
                                                and appellee.

* * * *

ARGUED
FEBRUARY 14, 2024
OPINION FILED **05/08/24**

KERN, Justice

[¶1.] James Joseph Lanpher, Jr. pled guilty to two counts of aggravated assault against a law enforcement officer and admitted to a part II habitual offender information. The charges arose out of an extremely dangerous high-speed chase during which Lanpher repeatedly fired weapons at pursuing officers. The circuit court sentenced Lanpher to serve two concurrent life sentences to run consecutively to sentences he was already serving for other offenses. Lanpher appeals, claiming his sentence was cruel and unusual in violation of the Eighth Amendment and was an abuse of the circuit court's discretion. We affirm.

### Factual and Procedural Background

[¶2.] The facts set forth herein are taken from the settled record, police reports, and the contents of the presentence investigation report (PSI). At approximately 2:00 p.m. on July 14, 2022, a South Dakota Highway Patrol (SDHP) trooper attempted to make a "precision interdiction stop" to pull over Lanpher's vehicle which was traveling westbound on South Dakota Highway 34 (Hwy 34) near the Minnesota border. Law enforcement suspected Lanpher of transporting drugs from Pipestone, Minnesota, to South Dakota. He was driving a 2014 Chrysler bearing license plate JIM JON. The Sioux Falls Area Drug Task Force (Task Force) previously identified Lanpher as a source of supply for methamphetamine coming into the Sioux Falls metropolitan area. As such, an electronic tracking surveillance device was installed on Lanpher's vehicle, which tracked his location to Pipestone on July 14. The Task Force believed that Lanpher would be picking up a fourteen-pound package of methamphetamine from his source in Pipestone.

[¶3.]	On the morning of July 14, Lanpher, a lifelong Sioux Falls resident, visited a friend's house in Sioux Falls prior to leaving for Pipestone where he encountered an old acquaintance, Bonner Juel. Lanpher and Juel soon left the friend's residence in Lanpher's vehicle with Lanpher driving. Juel later claimed he joined Lanpher to get high while riding in his car, but he did not know what Lanpher's plans were and was initially unaware that there were firearms in the vehicle. Lanpher and Juel began traveling north towards Pipestone after driving around Sioux Falls smoking marijuana. Before arriving in Pipestone, Lanpher and Juel pulled over to smoke methamphetamine, as well.

[¶4.]	After leaving Pipestone, Lanpher and Juel began traveling west back into South Dakota.[1] The Task Force requested assistance from the SDHP in stopping Lanpher. Trooper T.H.[2] was the first to encounter Lanpher around Egan, South Dakota, and began following the vehicle, which was then traveling west on Hwy 34.[3] Less than a mile before the Hwy 34 and Interstate 29 (I-29) exit, Trooper T.H. turned on his emergency lights and sirens and attempted to initiate a traffic stop of the vehicle. Lanpher did not comply and instead increased his speed,

---

1.	No packages of illegal drugs were found in Lanpher's vehicle. Juel later claimed that Lanpher never met with anyone while in Pipestone. Although Lanpher spoke to someone on his cell phone and they waited in a parking lot outside of an apartment complex, the rendezvous did not occur.

2.	At the victims' and State's request, the court ordered that the names of the victims remain nonpublic to the extent possible in the PSI and at the sentencing hearing. This Court has elected to designate the names of the victims referenced herein by their initials only.

3.	SDHP confirmed that Lanpher's driver's license was revoked at this time, providing additional grounds for the traffic stop.

continuing west on Hwy 34 past the I-29 exit. As the pursuit was moving at high speeds through towns and counties, additional officers were called to assist from multiple agencies and eventually dozens of officers were involved. Lanpher continued on Hwy 34 into Colman, South Dakota. Trying to evade pursuing officers, Lanpher turned south on 470th Avenue in Moody County, west onto 237th Street, south again onto 469th Avenue, and then back eastward on 240th Street to I-29 near mile-marker 104. During this portion of the pursuit, Lanpher drove erratically at dangerously high speeds on both paved and gravel roads, passing through intersections without stopping, and began leaning out his driver's window, firing his rifle back at the pursuing officers and their vehicles.[4]

[¶5.]        Upon returning to I-29, Lanpher entered the southbound lane and began traveling north at speeds varying between 80 to 100 miles per hour (mph) into oncoming traffic.[5] Lanpher traveled the wrong way on I-29 for roughly five miles before exiting west onto Hwy 34. From there, Lanpher returned to Colman, driving through several city streets and rural avenues, eventually returning to Hwy 34 where he traveled west, reaching speeds in excess of 100 mph. Hoping to distract the officers, while on 234th Street, Lanpher instructed Juel to throw

---

4.    Initially, Lanpher fired his rifle into the adjacent fields, but, after law enforcement continued the pursuit, he soon turned and aimed the rifle directly backwards towards the officers. This gunfire broke Lanpher's rear driver's side window.

5.    At Lanpher's speed, this put him and unsuspecting motorists at closing speeds of 160 to 180 mph.

Lanpher's shorter rifle, a .223 caliber Colt Model AR-15, and a blue box out the window, which Juel did.[6]

[¶6.] At approximately 2:30 p.m., Lanpher neared the outskirts of Madison, South Dakota, in Lake County. Continuing at high speeds in the oncoming traffic and center lanes and almost hitting multiple vehicles, Lanpher turned north on South Washington Avenue and then west onto Southeast 1st Street. While driving west on Southeast 1st Street in downtown Madison, between South Washington and South Egan Avenues, Lanpher again leaned out of his window while driving and fired back at the tailing officers.[7] Officers saw nearby pedestrians walking along the street drop to the ground trying to take cover. Others in a nearby park also took cover.[8]

[¶7.] Lanpher turned north onto Ramm Heights Drive, a residential neighborhood, from Southwest 1st Street after his vehicle had nearly run out of fuel. Out of gas, Lanpher came to a stop about 150 feet north of the intersection

---

6. Lanpher also ordered Juel to shoot at the officers and yelled "it's do or die," numerous times during the pursuit. Juel refused to shoot. After Lanpher requested Juel hand him his longer rifle, Juel positioned the rifle in the vehicle so that Lanpher could reach it. The blue box and shorter rifle were later recovered by law enforcement. The blue box contained LED lights. Mounted on the rifle was an optic sight that illuminated red, and the safety was in the fire position.

7. Thirteen spent shell casings from Lanpher's rifle were found in between South Harth and South Egan Avenues. Department of Criminal Investigation (DCI) Special Agent Hawks later obtained surveillance footage from East River Electric Cooperative, which he described in his report as depicting Lanpher using both hands to point his rifle backwards out his vehicle window.

8. Three bystanders who were in the park later gave statements to law enforcement detailing the incident.

and pulled his vehicle up alongside a truck facing south. The truck's driver, civilian S.H.[9], had his window down. Lanpher yelled at S.H. to give Lanpher his truck immediately, and Lanpher opened his vehicle door with his M&P rifle in hand. Upon recognizing the danger he was in and hearing the approaching sirens, S.H. quickly accelerated south and turned westward onto Southwest 1st Street.

[¶8.]    Troopers D.H. and J.A. were the first officers on scene at the Ramm Heights Drive intersection. As Trooper D.H. turned north off 1st Street, he saw Lanpher standing in the road, pointing his rifle and shooting at him. With little time to react, Trooper D.H. returned fire through his front windshield with his duty rifle, expending eleven rounds. Upon seeing Lanpher raise his rifle and hearing gunshots, Trooper J.A. stepped out of his vehicle and drew his duty pistol. Lanpher dropped his M&P rifle in the street and began running away. Trooper J.A. spotted Lanpher running away at an angle from him and fired four shots at Lanpher before he ran out of sight around the side of a house. As a result of the exchange of gunfire several rounds hit a nearby house belonging to S.J. and P.J., striking their deck railing and siding, with one piercing the picture window. Trooper J.A. ran over to Trooper D.H.'s vehicle to check if he was injured. Except for being a bit stunned from the exchange of fire and debris from his windshield, Trooper D.H. was unharmed. Trooper J.A. then reported on his vehicle's radio that Lanpher was wearing a red shirt and was on the loose in the neighborhood. Juel, who did not get

---

9.    The names of the civilians referenced herein, are also designated by their initials.

out of Lanpher's vehicle, had stuck his hands out of the passenger window to surrender. Trooper J.A. noticed Juel at this time and arrested him.

[¶9.]     As Lanpher fled the scene and ran in between houses, he attempted to break into S.J. and P.J.'s house. Because of the bullet that had pierced the picture window glass, the family was already gathered and heading for the basement to take cover. Lanpher entered the garage and as he started to open the door leading from the garage into the house, P.J., the father of the household, saw the door open and slammed the door shut with his body weight and locked it. The couple and their children took cover in their basement and called 911 to report the break-in attempt, remaining there until law enforcement arrived and cleared the house.[10]

[¶10.]     Lanpher continued to evade officers and made his way across the Ramm Heights neighborhood, moving towards the northwest. After coming across an unattended four-wheeler in a backyard, Lanpher climbed on, put it in reverse, but backed into a tree. He then abandoned it and continued moving on foot to the northwest, moving into a shelterbelt. DCI Special Agent Jake Niedringhaus was watching the northern perimeter of the area from his vehicle in the parking area between the bowling alley and the movie theater. After a few minutes, Special

---

10. Other Ramm Heights residents also heard the gunshots and commotion. One resident, R.M., was sitting by his home's picture window when he heard gunshots and saw Lanpher in the street. Other residents, T.M. and H.A., locked all the doors to their houses. B.P. was working in his basement when he heard the shots. When he stepped outside his garage to investigate, he saw Juel being arrested and officers instructed him to return inside his house. L.C. was driving with a friend and her children on 1st Street in her UTV when she saw Lanpher's vehicle being pursued by officers. After arriving at her nearby home, her group was still standing in her driveway when Lanpher fired at the police vehicles. They ran inside L.C.'s house and took cover.

Agent Niedringhaus spotted Lanpher emerge from the shelterbelt, moving north towards the east side of the bowling alley. After being confronted on the north and south sides of the bowling alley by officers, Lanpher was apprehended by Special Agent Niedringhaus with the assistance of SDHP Sergeant Kristoff DeKramer. Officers obtained search warrants for blood and urine samples from Lanpher and Juel. These test results showed both Lanpher and Juel had methamphetamine and THC in their systems at the time of the pursuit. A search of Lanpher's vehicle revealed five additional guns, a large amount of ammunition, and drug paraphernalia.[11]

[¶11.] Lanpher was charged by the State, via complaint, on July 18, 2022, with four offenses: two counts of attempted first-degree murder, or in the alternative, aggravated assault on a law enforcement officer, and two counts of commission of a felony while armed with a firearm. Lanpher was indicted by a Lake County grand jury for the same counts on July 20, 2022. Additionally, the State filed a part II information pursuant to SDCL 22-7-8, alleging that Lanpher had previously been convicted of five prior felonies including a crime of violence. He

---

11. The seven weapons involved in the incident included four handguns, two rifles, and one shotgun. The firearms found in Lanpher's passenger compartment were a 9mm semiautomatic pistol, and a .40 caliber Sig Sauer semiautomatic pistol. The firearms found in the vehicle's trunk were a 12-gauge American Tactical pump action shotgun, a .45 caliber Springfield Armory semiautomatic pistol, and a .44 Magnum caliber Ruger Model Redhawk revolver. The rifle Juel threw out the window on 234th Street was a .223 caliber Colt Model AR-15 semiautomatic rifle. The rifle dropped by Lanpher on Ramm Heights Drive was a .223 caliber M&P semiautomatic rifle. Some of these weapons were loaded with ammunition, including the two rifles. Law enforcement also found in the car $1,000 in cash in $100 bills, a syringe that tested positive for methamphetamine, two marijuana and methamphetamine smoking pipes, and several cell phones.

was appointed counsel and later co-counsel and appeared for arraignment on August 3, 2022, entering pleas of not guilty to all charges.

[¶12.] On April 18, 2023, pursuant to the terms of a written plea agreement, Lanpher pled guilty to two counts of aggravated assault on a law enforcement officer, in violation of SDCL 22-18-1.1(2) and 22-18-1.05, a Class 2 felony punishable by up to 25 years in prison and or a $50,000 fine. He also admitted to the part II information, enhancing the possible penalty for each offense to that for a Class C felony carrying a maximum sentence of up to life in prison and or a $50,000 fine.[12] Lanpher also agreed to pay restitution, costs, and fees. In exchange for the plea, the State agreed to dismiss the remaining counts in the indictment and two other cases and to cap its sentencing request at 75 years of actual incarceration with additional time suspended. The parties agreed that the court would retain discretion to determine if the sentences should be served concurrently or consecutively to each other and to Lanpher's preexisting sentences. The court ordered a PSI and set the matter for a sentencing hearing on June 14, 2023.

[¶13.] Prior to the hearing, Lanpher filed a sentencing brief arguing factors in mitigation and comparing Lanpher's conduct with that of nine other defendants sentenced in South Dakota including three sentenced in Lake County by the circuit court. After hearing argument from the parties, Lanpher's allocution, and having considered the PSI, which contained the police reports, videos of the high speed

---

12. Lanpher's five prior felony convictions—all occurring in Minnehaha County— were: possession of a controlled substance—Schedule I or II (2015), pimping (2015), and in 2019, two convictions for possession of a controlled substance and a conviction for aggravated assault against a law enforcement officer.

chase, letters in support of Lanpher, and victim impact letters, the court sentenced Lanpher to two concurrent life sentences for each count of aggravated assault on a law enforcement officer.[13] The court ordered credit for time served and directed that the sentences be served consecutively to Lanpher's other sentences.[14] In fashioning the sentences, the court stated that it had considered all sentencing factors, but particularly addressed Lanpher's "moral character, mentality, age, tendencies, inclination to commit crime, previous criminal record, and [ ] poor rehabilitation prospects." The court stated,

> Your criminal record, however, is long, violent, and clearly distinguishable from the cases your attorneys cited. Since 2001, the only years you have gone without a conviction are '03, '07 to '11, '16 through '18. And it's interesting to note, again, that you were under supervision from 2016 to the 2018 time frame. Your criminal record includes theft; DUI; obstruction of an officer; seven habitual offender convictions; possession of a controlled substance; pimping and promoting prostitution; aggravated eluding; aggravated assault against a law enforcement officer, four times. In addition to your long list of convictions, you have been charged multiple times with pimping; five times with aggravated assault; threatening a law enforcement officer two times; domestic assault no less than six times, maybe as high as ten; simple assault, no less than five times, maybe as high as eight.
>
> . . .
>
> The facts of this case prove beyond any doubt to this Court that you have a dangerous and flawed moral character. Your mentality and attitudes towards the rights and safety of others is that you are willing to hurt anybody for your own gains. Your violent and long record shows that your inclination to commit

---

13. *See* SDCL 24-15-4. Lanpher is still eligible for compassionate parole, as are all convicts with life sentences.

14. At the time of the offense, Lanpher was on parole for the three 2019 convictions from Minnehaha County.

> crime has no limits. Your history shows a complete lack of
> moral character and value for human life.

[¶14.] The court also referenced the facts of the 2018 incident that resulted in the three 2019 convictions included in Lanpher's habitual offender information. In Sioux Falls in 2018, law enforcement attempted to serve Lanpher with an arrest warrant, using a task force to do so because Lanpher was suspected of committing "aggravated assault with a gun, kidnapping, and theft of a vehicle." The officers did not attempt to arrest Lanpher until he had pulled his vehicle into a garage. An officer then parked behind Lanpher so he could not get out. Lanpher proceeded to back into the officers' vehicle, ramming it a total of fifteen to twenty times. Lanpher then began ramming his vehicle into the front of the garage in an attempt to break through the wall and escape. While doing this, the vehicle became stuck. The frictional heat generated from his tires spinning started a fire which burned the building to the ground. Lanpher then attempted to escape the building on foot but was captured.

[¶15.] The court also addressed Lanpher regarding his actions of July 14, 2022, stating:

> In this case, you, frankly, did all you could to kill a law
> enforcement officer or innocent citizen. You recklessly and
> intentionally fired your weapon at the pursuing officers, both in
> the country and in town; not only putting the officers' lives at
> risk, but the innocent bystanders in their homes, businesses,
> and on the streets or sidewalks, all at risk with any crossfire
> from you and officers.
>
> You drove the wrong way down the highway, the Interstate,
> through Washington Avenue in Madison and Colman, at speeds
> up to 100 miles per hour. You ran multiple stop signs, each time
> risking the lives of men, women, and children that might be in
> your way.

> The only reason there wasn't a body count between your driving and shooting is unexplainable luck. It is nothing short of a miracle that there was no loss of life. . . . [Y]our conduct shows this Court that you were willing to commit whatever offense it took to get away.

[¶16.]    The court concluded its sentencing analysis by summarizing its observations of Lanpher's actions, character, and criminal record:

> Based on your moral character, mentality, age, tendencies, inclination to commit crime, previous criminal record, I find that you cannot be rehabilitated. A finding that you could be rehabilitated would be a death sentence to any officer who might encounter you in the future, along with the citizens of this state that may get in your way.

[¶17.]    Lanpher appeals the circuit court's sentences, raising two issues for our review:

>    1.    Whether Lanpher's sentence constitutes cruel and unusual punishment in violation of the Eighth Amendment.
>
>    2.    Whether the circuit court abused its discretion in the imposition of Lanpher's sentence.

### Analysis and Decision

#### *Eighth Amendment*

[¶18.]    "[W]hen the question presented is whether a challenged sentence is cruel and unusual in violation of the Eighth Amendment, we conduct a de novo review."[15] *State v. Caffee*, 2023 S.D. 51, ¶ 16, 996 N.W.2d 351, 357–58 (alteration in original) (quoting *State v. Manning*, 2023 S.D. 7, ¶ 47, 985 N.W.2d 743, 757). "The

---

15.    Inexplicably, the State contends that Lanpher has waived—by not citing sufficient authority—his right to challenge his sentence as cruel and unusual punishment or as an abuse of the circuit court's discretion. However, Lanpher cites the Eighth Amendment of the United States Constitution, case law and statutory authority to support his argument on appeal.

Eighth Amendment to the United States Constitution prohibits 'cruel and unusual punishment[.]'" *Id.* ¶ 16, 996 N.W.2d at 358 (quoting U.S. Const. amend. VIII)). "This restriction applies to the states through the Fourteenth Amendment." *Id.*

[¶19.] "In determining whether a noncapital sentence is in violation of the Eighth Amendment, we must decide whether the sentence is 'grossly disproportionate to its corresponding offense.'" *Id.* (quoting *Manning*, 2023 S.D. 7, ¶ 48, 985 N.W.2d at 757). "To do so, we first compare the gravity of the offense— i.e., 'the offense's relative position on the spectrum of all criminality'—to the harshness of the penalty—i.e., 'the penalty's relative position on the spectrum of all permitted punishments.'" *Id.* "This analysis will 'typically mark[ ] the end of our review' as gross disproportionality is rarely found." *Id.* (alteration in original). "If the penalty does appear 'to be grossly disproportionate to the gravity of the offense, then we will compare the sentence to those imposed on other criminals in the same jurisdiction as well as those imposed for commission of the same crime in other jurisdictions.'" *Id.* (quoting *Manning*, 2023 S.D. 7, ¶ 48, 985 N.W.2d at 758).

[¶20.] We first examine the gravity of Lanpher's offense. He pled guilty to two counts of aggravated assault on a law enforcement officer under SDCL 22-18-1.1(2) and 22-18-1.05. On the spectrum of all possible criminal activity, aggravated assaults are not generally considered the most serious; this designation is usually reserved for crimes involving homicide. *See State v. Ceplecha*, 2020 S.D. 11, ¶ 59, 940 N.W.2d 682, 698. However, aggravated assaults, particularly those committed against law enforcement officers, are high on the overall spectrum of criminal activity.

[¶21.] Further, in addition to the underlying offense, Lanpher has a long and serious prior criminal history, resulting in his habitual offender status. In cases where the offender's "sentence is enhanced because of the offender's recidivism, then the gravity of his past offenses also contributes to the gravity of the present offense." *State v. Chipps*, 2016 S.D. 8, ¶ 36, 874 N.W.2d 475, 488. In *Chipps*, the State had filed a part II information and Chipps admitted to two prior felonies. We found the number and nature of the prior offenses, "relevant to an Eighth Amendment analysis of this sentence . . . . [N]ot only has Chipps demonstrated a tendency to commit felonies, he has demonstrated a particular penchant for the same type of crimes charged here . . . ." *Id.* ¶ 40, 874 N.W.2d at 490. Lanpher admitted the five prior felony convictions alleged in the part II information, which included two 2019 convictions for possession of a controlled drug or substance and a conviction for aggravated assault on a law enforcement officer, the latter of which is a crime of violence. *See* SDCL 22-1-2(9).

[¶22.] Lanpher's actions resulting in these two convictions were gravely serious and properly placed at the upper end of the spectrum of criminal conduct. Considering the conduct Lanpher exhibited on July 14, as well as that demonstrated in the past, we see this conduct as a grave offense compared to others on the criminal spectrum. Lanpher's actions, enhanced by his recidivism, are representative of a callous disregard for the laws of society and human life in order to further his own interests.

[¶23.] Next, we examine the harshness of Lanpher's sentences. The most severe punishments authorized by the Legislature include "death (Class A felonies)

and mandatory life imprisonment (Class A and Class B felonies)." *State v. Rice*, 2016 S.D. 18, ¶ 15, 877 N.W.2d 75, 80. Lanpher received two life sentences for Class C felonies, without eligibility for parole. SDCL 24-15-4 ("No inmate sentenced to life imprisonment is eligible for parole . . . ."). Such a sentence is second only to the death penalty in terms of harshness and should only be imposed on defendants for a correspondingly grave offense. Although the maximum consecutive sentences that Lanpher could have received for the aggravated assault convictions alone was 50 years in prison and imposition of a $100,000 fine, his dangerous behavior was coupled with a habitual offender admission including a crime of violence per SDCL 22-7-8. The Legislature has determined that the maximum sentence under this provision for violent habitual offenders is that of a Class C felony—life in prison. While such enhanced sentences are not often imposed, even under SDCL 22-7-8 this is an unusual case. Based on our review of the record, we do not find the gravity of Lanpher's offenses grossly disproportionate to the harshness of his punishment.

[¶24.]     Although Lanpher urges us to compare his sentence to those given to other criminals in the same jurisdiction, "this argument overlooks the fact that we would engage in a proportionality analysis only if we had determined [Lanpher's] sentence to be grossly disproportionate." *State v. Black Cloud*, 2023 S.D. 53, ¶ 79, 996 N.W.2d 670, 688. Because the harshness of Lanpher's sentence is not grossly disproportionate to the gravity of his offenses, we will not compare his sentence to those imposed on other criminals for the same crime within or outside the same jurisdiction.

***Abuse of Discretion***

[¶25.] A circuit court's sentencing decision is usually reviewed for an abuse of discretion. *Caffee*, 2023 S.D. 51, ¶ 26, 996 N.W.2d at 359–60. "An abuse of discretion is a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on full consideration, is arbitrary or unreasonable." *Id.* ¶ 26, 996 N.W.2d at 360.

[¶26.] When this Court reviews a circuit court's discretion, it does not "substitute its judgment for that of the sentencing court as to the appropriateness of a particular sentence." *State v. Toavs*, 2017 S.D. 93, ¶ 14, 906 N.W.2d 354, 358. Instead, "[c]ircuit courts have broad discretion in sentencing." *Caffee*, 2023 S.D. 51, ¶ 27, 996 N.W.2d at 360; *see also Rice*, 2016 S.D. 18, ¶ 23, 877 N.W.2d at 83 ("Within constitutional *and* statutory limits, the trial courts of this state exercise broad discretion when deciding the extent and kind of punishment to be imposed."). Nonetheless, "[c]ourts should consider the traditional sentencing factors of retribution, deterrence—both individual and general—rehabilitation, and incapacitation." *Caffee*, 2023 S.D. 51, ¶ 27, 996 N.W.2d at 360. Courts should weigh these factors "on a case-by-case basis" and may determine "which theory is accorded priority" in a particular case. *Id.* Additionally, "courts must consider sentencing evidence tending to mitigate or aggravate the severity of a defendant's conduct and its impact on others. Sentencing courts are often required, in this regard, to accurately assess the 'true nature of the offense.'" *State v. Mitchell*, 2021 S.D. 46, ¶ 30, 963 N.W.2d 326, 333 (quoting *State v. Klinetobe*, 2021 S.D. 24, ¶ 36, 958 N.W.2d 734, 742).

[¶27.]      Lanpher contends the circuit court abused its discretion by giving too little weight to the mitigating evidence presented. At the sentencing hearing, and in his brief, Lanpher's counsel described him as a 41-year-old devoted father of three. Based on his contacts with Lanpher, counsel informed the court that he found him to be "soft spoken, kind and talented and generous"—someone who, when not using methamphetamine, is "responsible, diligent and reliable." Additionally, counsel argued that the two year-period from 2016 to 2018, when Lanpher was on parole and did not receive another conviction, demonstrated his ability to be rehabilitated.

[¶28.]      Lanpher also contends that the court failed to consider his statements at the sentencing hearing about "his moral character, mentality, inclination to commit crime, and habits." Lanpher argued that he suffered from mental illness and substance abuse at the time, which contributed to his crimes. He informed the court that he now meets with a counselor to help resolve these issues. Finally, Lanpher told the court that he was only intending to scare the officers by firing weapons at them, and that he had no intention of injuring them or anyone else he encountered while trying to escape. He argues this is corroborated by the fact "that there was no damage to any police or patrol vehicle, no injury to any officer, no damage in the immediate vicinity of the officers, nor in the backdrop immediately behind the officers," from the shots he fired. Lanpher contends that these facts reflect positively on his mentality, habits, moral character, and show "if not an aversion to commit crime, an aversion to cause harm to people," and that the circuit

court failed to properly consider them. Based on our review of this record, we disagree.

[¶29.] In imposing sentence, the court considered the details of the incident including Lanpher's reckless driving, the high speeds at which he drove, and the danger he posed to all who encountered him on July 14, 2022. The court indicated that it had studied and considered all sentencing factors and documents contained in the PSI. During the sentencing hearing, the circuit court discussed Lanpher's criminal history, referencing the egregious facts underlying the 2018 incident in Sioux Falls, where Lanpher rammed a police vehicle 15–20 times while it was blocking his escape from a garage. The fact that the present offenses took place after Lanpher's conviction and sentencing from that incident demonstrates his lack of rehabilitation and his ongoing inclination to commit crimes. We also note the similarity of Lanpher's conduct in the aggravated assault in 2018 to the facts of this case.[16] Thus, the record reveals that the circuit court considered the appropriate sentencing factors when reaching its decision.

[¶30.] The court did accord certain theories priority, which was well within its purview. These were Lanpher's moral character, mentality, tendencies, inclination to commit crime, previous criminal record, and his poor rehabilitation

---

16. Although a comparison between Lanpher's case and other aggravated assault cases was unnecessary, the court distinguished the three Lake County cases Lanpher presented, in support of his argument for a shorter sentence. The court having presided over the three prior cases noted the significant difference in the defendants' prior criminal records, which were minor to nonexistent, when compared with Lanpher's long and violent criminal history.

prospects.[17] Simply put, the circuit court's finding that the aggravating factors in Lanpher's case outweighed those in mitigation does not amount to a fundamentally wrong or impermissible choice. On the contrary, Lanpher pled guilty to these aggravated assault offenses and the part II information and agreed to the State's proffered factual basis, which included Lanpher pointing firearms at officers and pulling the trigger. By his own admission, Lanpher attempted "to cause . . . bodily injury to another with a dangerous weapon," which is substantiated by the other witness and victim testimonies, surveillance video, and Lanpher's behavior, both in the past and on July 14, 2022. SDCL 22-18-1.1(2). While Lanpher argues the court abused its discretion by requiring his sentence to run consecutively to his preexisting convictions, this was well within the court's authority. The Legislature

---

17. Lanpher argues that the circuit court impermissibly examined his entire criminal record, including charges that did not result in criminal convictions. In his view, the court should have only considered his past convictions when crafting his sentences. He claims the court erred by considering charges that did not result in convictions, violating the Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution. However, we have previously held that "[a] court is permitted to consider uncharged conduct when acquainting itself with the character of the defendant for sentencing." *State v. Tiegen*, 2008 S.D. 6, ¶ 47, 744 N.W.2d 578, 594 (citing *State v. McKinney*, 2005 S.D. 74, ¶ 17, 699 N.W.2d 460, 465–66). Furthermore, "[c]ourts have recognized that the broad range of evidence that may be considered at sentencing even includes inquiry into 'uncharged conduct or even conduct that was acquitted,'" because sentencing determinations are made under a preponderance of the evidence standard, unlike criminal convictions. *State v. Arabie*, 2003 S.D. 57, ¶ 21, 663 N.W.2d 250, 257 (quoting *U.S. v. Schaefer*, 291 F.3d 932, 944 (7th Cir. 2002)). Here, the court principally relied upon the 2018 incident mentioned above which was supported by evidence adduced at an earlier, pre-plea-agreement hearing to determine its admissibility under SDCL 19-19-404(b). The circuit court did not abuse its discretion by considering uncharged conduct.

has vested circuit courts with the authority to hand down consecutive sentences. *See State v. Yeager*, 2019 S.D. 12, ¶ 9, 925 N.W.2d 105, 110.

[¶31.] Without additional context, a life sentence without parole could be seen as an arbitrary or unreasonable penalty for an aggravated assault conviction enhanced by habitual offender status in violation of SDCL 22-7-8. However, the facts of this case reveal just how severe an aggravated assault committed by a violent habitual offender can be and how dangerous Lanpher was not only to the general public, but to law enforcement officers trying to engage with him in the community. Indeed, the circuit court could have fairly regarded the true nature of Lanpher's actions as attempted murder by rejecting Lanpher's self-serving explanation that he was merely trying to convince law enforcement officers to end their pursuit.

[¶32.] Here, Lanpher began his exploits on July 14, 2022, by operating a vehicle while under the influence of both marijuana and methamphetamine. When law enforcement officers attempted to stop him, he refused to comply and tried to escape. During the pursuit, Lanpher began shooting multiple weapons at law enforcement officers while driving erratically and extremely dangerously on city, county, and state roads to elude them. He endangered all he encountered, either walking or driving, by speeding up to 100 mph and weaving in and out of oncoming traffic lanes.

[¶33.] In one of his most flagrant acts, Lanpher drove five miles northward in the southbound lane on I-29, approaching oncoming vehicles head-on. With closing speeds reaching 180 mph, this meant Lanpher and southbound traffic were

approaching one another at the rate of 88 yards a second. An oncoming driver 500 yards away had as little as 5.7 seconds to recognize this danger and react before his vehicle reached Lanpher's. In downtown Madison, bystanders fell to the ground, taking cover in the library park and on bare sidewalks because of Lanpher's gunfire. This chase ended only because Lanpher's vehicle ran out of fuel. Yet, even after this, Lanpher refused to comply with law enforcement. He instead attempted to continue running away by carjacking a truck where his vehicle came to rest. After this failed, Lanpher again shot four times directly at officers' vehicles in a dense residential area—endangering many residents there, as well—and took off running when the officers returned fire. Lanpher chose to run despite Juel surrendering.

[¶34.] Lanpher next tried to escape detection by attempting to break into a nearby family residence, one that had already been struck by several bullets as a result of the gunfire. The terrified residents were attempting to take cover in the basement when the father of the household realized that Lanpher was in the garage and opening the door to the house. The father foiled the break-in by quickly throwing his body against the door to close and lock it. Next, Lanpher attempted to steal a four-wheeler, and after this ended without success, he continued to flee on foot. It was not until officers surrounded him with their firearms drawn that he finally surrendered. As the circuit court stated, it is only by "unexplainable luck" that Lanpher or someone else was not killed as a result of his actions. Lanpher's conduct towards officers and innocent bystanders could have easily led to multiple fatalities, including the loss of his own life.

[¶35.]     In short, our review of the record reveals extensive aggravating factors which support the circuit court's decision to impose two life sentences without the possibility of parole.[18]  While we do not make this determination lightly, we hold the circuit court did not abuse its discretion in imposing life sentences under the facts of this case.

## Conclusion

[¶36.]     In light of Lanpher's violent criminal history and demonstrated disregard for human life, his sentence is not grossly disproportionate to the gravity of his offenses and thus does not violate the Eighth Amendment.  Additionally, given the seriousness of Lanpher's conduct, the circuit court's decision to impose two life sentences was not an abuse of discretion.  We affirm.

[¶37.]     JENSEN, Chief Justice, and SALTER, DEVANEY, and MYREN, Justices, concur.

---

18.    We also note the circuit court's authority to sentence Lanpher more severely than requested by the State.  "There is . . . no question that a sentencing court is free to disregard the recommendations of the parties, as well as those of the PSI author if, in the court's judgment, a much higher sentence is warranted."  *State v. Mitchell*, 2021 S.D. 46, ¶ 48, 963 N.W.2d 326, 337 (DeVaney, J., concurring).